SHORE FISHERY, INCORPORATED, PROSECUTOR, v. BOARD OF REVIEW OF THE NEW JERSEY UNEMPLOYMENT COMPENSATION COMMISSION AND SOREN HANSEN, RESPONDENTS.

SEASIDE FISH COMPANY, PROSECUTOR, v. BOARD OF REVIEW OF THE NEW JERSEY UNEMPLOYMENT COMPENSATION COMMISSION AND FRANS FOGELBERG SWANSON, RESPONDENTS.

Submitted May 6, 1941—Decided August 14, 1941.

88

Before Justices BODINE, PERSKIE and PORTER.

For the prosecutors, *Benjamin M. Schlossbach* (*Henry K. Golenbock* and *David Weinstein* (of the New York bar), of counsel).

For the respondents, *Clarence F. McGovern.*

The opinion of the court was delivered by

PERSKIE, J.   This cause requires that we decide whether the Board of Review of the State Unemployment Compensation Commission properly concluded that Soren Hansen and Frans Fogelberg Swanson were eligible for benefit payments

pursuant to our state Unemployment Compensation Law. *N. J. S. A.* 43:21-1, *et seq.*

Prosecutors contend that these claimants (employees) are members of a "crew" and that therefore the New Jersey statute fails to cover them because of the provisions therein that "The term 'employment' shall not include    *   *   * services performed as an officer or member of the crew of a vessel on the navigable waters of the United States." *N. J. S. A.* 43:21-19 (i) (7) (C). Additionally, prosecutors contend that these claimants could not be covered by the state act without violating article 3, section 2 of the Constitution of the United States which provides that "The Judicial power shall extend   *  *  * to all cases of admiralty and maritime jurisdiction."

Save as to difference in the amount of benefit payments, which each claimant was awarded, the facts are admittedly the same in each case and are not in dispute. As found by the Board of Review they are, in so far as are here pertinent, in substance, as follows:

The employers are engaged in the business of catching fish, from pound nets set in the Atlantic Ocean, *within the territorial limits of New Jersey,* preparing such fish and shipping them to the market for sale. They maintain an establishment on the shore. In order to catch fish, groups of eight men each launch open boats, of less than ten tons burden, through the surf, which can be propelled either by motor or by oars; the boats are not motor driven when launched through the surf but are propelled by their occupants pulling on a line which is stretched from a pole set in the ocean floor outside the surf to a pole set in the beach; when the boat is thus hauled past the surf by all the occupants pulling on the rope, then the motor is used to propel the boat to the pound net. When the boat is motor driven, only two men, the steersman and operator of the motor, have any duties to perform. On reaching the pound, which may be a half mile to two miles off shore, the engine is stopped and the occupants of the boat haul in the net and secure the fish, repair any damage done to the net and re-set the net. On the way in the men sometimes engage in cleaning the boat or in cleaning or grading the

fish; after landing on shore they remove the fish from the boat and sometimes assist in cleaning and grading the fish. The boats are required to be registered with the federal government. The men do not sign articles as members of a crew; they may quit their jobs at their own pleasure; they are former seamen but are not required so to be. Knowledge of handling rope is the chief duty they have in common with seamen but it takes just as long to develop a seaman into a competent fisherman as it would to develop a landsman. The men work about ten hours a day; about one hour a day at the most is spent in hauling the boat through the surf, the greater portion of their time is consumed in hauling the boat from point to point at the pound and in handling the nets; less than half their time is spent on land. At the beginning of the season the men are assigned to groups and each group is assigned to a boat for the fishing season. They are not subject to the same discipline as seamen on a vessel at sea. They regard the man in charge of each group as a "boss" rather than a sea captain; they remain under his direction when working on land as well as on the water; while maneuvering the boat with ropes, each man has regularly assigned duties; the main purpose of his employment is to catch fish, all other duties are incidental thereto. The claimants in these causes, were engaged as pound fishermen. The employers had eight or more individuals in their employ in New Jersey during more than 20 weeks in 1936, 1937 and 1938.

1. Were the services of claimants performed as members "of the crew of a vessel on the navigable waters of the United States?"

The boats involved must be considered as vessels (*Perry v. Haines,* 191 *U. S.* 17; 48 *L. Ed.* 73), and the water is navigable (*Miller v. Mayor of New York,* 109 *U. S.* 398; 27 *L. Ed.* 971; *United States v. Appalachian Electric Power Co.,* 311 *U. S.* 377; 85 *L. Ed.* 243). The word "crew" has several well known significations. Here we are concerned only with the definition generally employed in maritime law, in which branch of the law it is often said that "when the crew of a vessel is referred to, those persons are naturally and

primarily meant who are on board her aiding in her navigation, without reference to the nature of the arrangement under which they are on board." 15 *C. J.* 1454; 21 *C. J. S.* (*Crew*) 1149, 1150.

In the instant case, claimants were on board for the purpose of catching fish. Whatever duties they performed in navigating the vessel were performed as a means to accomplish the primary end in view. Their position is clearly distinguishable from a cook's, a fireman's (15 *C. J.* 1454, *note* 46), or a wireless operator's (*The Buena Ventura,* 243 *Fed. Rep.* 797) whose duties are performed primarily with the end objective of aiding the progress of the vessel through the water, *i. e.,* aiding in the navigation of the vessel, and not in accomplishing some result after the vessel has arrived at its destination.

In addition, claimants' contracts of hire were not entered into with the captain of the vessel; no articles were signed; nor were time cards kept by the captain; nor did claimants sleep aboard the vessels. In relation to the vessels on which claimants worked, their duties were more properly within the category of local fishermen and not members of a crew. *Cf. Moore Dry Dock Co.* v. *Pillsbury,* 100 *Fed. Rep.* (2d) 245; *Diomede* v. *Lowe,* 87 *Id.* 296.

In *South Chicago Coal and Dock Co.* v. *Bassett,* 309 *U. S.* 251: 84 *L. Ed.* 732, Mr. Chief Justice Hughes held that a person employed on a lighter which supplied coal to other vessels and whose principle duties were to facilitate the flow of coal, was not a member of the crew although he occasionally assisted in cleaning the lighter and throwing the ship's rope in making the lighter fast. After reviewing the various definitions, the Chief Justice pointed out that "the word 'crew' does not have an absolutely unvarying legal significance. To determine whether, in each case, those involved are to be regarded as members of a crew, requires a consideration of the purpose and context of the particular statute under consideration. In the instant case, the purpose and context of the statute involved may best be gathered by a resort to the state legislature's own declaration.

*N. J. S. A.* 43:21-2, expressly declares that "as a guide to the interpretation and application" of the statute involved,

the policy of the state is declared to be to prevent the spread and to lighten the burden of involuntary unemployment in our state. The express reason for this declaration is stated to be for the purpose of "maintaining purchasing power," and limiting the "serious social consequences of poor relief assistance" and "economic insecurity due to unemployment" which "is a serious menace to the health, morals, and welfare of the people of this state."

Claimants here are employees who work entirely within the territorial limits of our state. They are, primarily, fishermen who, each day proceed to a spot no farther than two miles from the shore. They return, each day, to the very same spot on the shore whence they departed. They perform some of their duties on land. Their labors carry them to no foreign ports nor to any distant lands. They do not sleep aboard any ship. In accordance with the legislative declaration, the maintenance of their purchasing power is necessary for the general welfare of the state. Claimants are, plainly, amongst that very group of people whose "involuntary unemployment" our legislature has expressly declared to be a "subject of general interest and concern which requires appropriate action by the legislature." The purpose and context of our statute, therefore, make it clear that regardless of any definitions to the contrary, the word "crew" incorporated into the provisions excluding from the act "members of the crew of a vessel on the navigable waters of the United States" should here be interpreted in such a manner as not to include these particular claimants.

Prosecutors urge that because the federal government, by regulation, has interpreted these very words in the federal statute so as to include claimants as members of a crew and because Congress has amended the federal Social Security Act so that the act itself now expressly excludes fishermen from coverage, therefore, we should construe our act so as to include claimants as members of a crew and thus exclude them from coverage under our state act.

It is clear, however, that our courts are not bound by constructions which the federal administrative agencies have placed upon those federal statutes which are similar to our

own. *Cf. Public Service Railway Co.* v. *Public Utility Commissioners,* 81 *N. J. L.* 364; 80 *Atl. Rep.* 27. Nor are we in anywise bound by the amendment to the federal act; for, as stated by Mr. Justice Cardozo in *Chas. C. Steward Mach. Co.* v. *Davis,* 301 *U. S.* 548; 81 *L. Ed.* 1279, 1294, the federal "statute does not call for a surrender by the states of powers essential to their *quasi*-sovereign existence." Nor does the desire for a national co-operative scheme in anyway demand a uniform interpretation of the words here in question. The dual co-operative nature of administration of the act was originally invoked so as to prevent economic disadvantages from resulting to those states which enacted unemployment compensation legislation in the total absence of similar legislation by the sister states. *Cf. Buckstaff Bath House Co.* v. *McKinley,* 308 *U. S.* 359; 84 *L. Ed.* 322, 326. In the instant case, there is no harm that can come to the general scheme by our interpretation. Those slight disadvantages which might occur (these employers may move to states which follow a contrary interpretation) would hardly induce our legislators to end our participation in the general scheme and thus forego its other advantages. Moreover, our legislature is free to amend the statute in the same manner as did the United States Congress. On the other hand, when, as here, we construe the word "crew" so as not to refer to these claimants, and thus interpret the act so as to provide them with relief, we, in fact, further the general desired plan of broadening the base for taxation and increasing the benefits bestowed.

2. Is it a violation of the Federal Constitution (article 3, section 2) to allow these claimants to recover?

The general principles here applicable are more easily stated than applied. The admiralty clause of the Federal Constitution is interpreted, in substance, in the same manner as the commerce clause; and the application of both are here in question. Where the subject is national in its character, the United States Congress alone can act. The absence of any law of Congress when the subject is national in its character is equivalent to its declaration that that particular subject should not be regulated by the states. On the other hand, when the subject is a local one, the states may legislate so

long as their legislation is not inconsistent with the federal legislation. *Cf. Southern P. Co. v. Jensen,* 244 *U. S.* 205; 61 *L. Ed.* 1086; *Grant Smith-Porter Ship Co.* v. *Rohde,* 257 *U. S.* 469; 66 *L. Ed.* 321; *Cooley* v. *Board of Wardens of the Port of Philadelphia,* 53 *U. S.* 299; 13 *L. Ed.* 996; *Leisy* v. *Hardin,* 135 *U. S.* 100; 34 *L. Ed.* 128; *Clark Distilling Co.* v. *Western Maryland,* 242 *U. S.* 311; 61 *L. Ed.* 326.

The determination of what is local in character and what is national in character is often a difficult task. Some of the decided cases, while sometimes irreconcilable, shed some light upon the problem. In the past, it has been held that a state statute may impose a lien upon a vessel in her own port for repairs (*Rodd* v. *Heartt,* 88 *U. S.* 558; 22 *L. Ed.* 654; *The J. R. Rumbell,* 148 *U. S.* 1; 37 *L. Ed.* 345); pilotage fees may be fixed (*Cooley* v. *Port Wardens,* 53 *U. S.* 299; 13 *L. Ed.* 996); the right may be given to recover in death cases (*Old Dominion Steamship Co.* v. *Gilmore,* 207 *U. S.* 398; 52 *L. Ed.* 264); a dam or bridge may be built pursuant to state legislation (*Wilson* v. *The Black Bird Creek Marsh Co.,* 27 *U. S.* 245; 7 *L. Ed.* 412; *Gilman* v. *Philadelphia,* 70 *U. S.* 713; 18 *L. Ed.* 96); information may be required from masters of vessels (*Mayor of New York* v. *Miln,* 36 *U. S.* 102; 9 *L. Ed.* 648); an exclusive right to use a navigable stream may be granted to a ferry (*Conway* v. *Taylor, Exr.,* 66 *U. S.* 622; 17 *L. Ed.* 191); a state may regulate fares of an ordinary ferry from its shore (*Port Richmond and B. P. Ferry Co.* v. *Board of Chosen Freeholders,* 234 *U. S.* 316; 58 *L. Ed.* 1330).

On the other hand, it has also been held that a state cannot authorize proceedings *in rem* as used in the admiralty courts (*The Moses Taylor* v. *Hammons,* 71 *U. S.* 408; 18 *L. Ed.* 397; *The Glide,* 167 *U. S.* 606; 42 *L. Ed.* 296); liens for material used to repair a foreign ship cannot be created (*The Roanoke,* 189 *U. S.* 184; 47 *L. Ed.* 770). An interstate ferry cannot be subject to a state excise tax (*Gloucester Ferry* v. *Commonwealth of Pennsylvania,* 114 *U. S.* 196; 29 *L. Ed.* 158); a state cannot require a Canadian corporation to pay a license fee for an international ferry (*City of Sault Ste. Marie* v. *International Transit Co.,* 234 *U. S.* 333; 58 *L. Ed.*

1337) ; a city cannot grant an exclusive license to run a ferry between states (*Mayor and Board of Aldermen* v. *McNeeley,* 274 *U. S.* 676; 71 *L. Ed.* 1292).

A study of the above cases indicates that if the subject-matter in question is strictly local in character and is not hostile nor materially prejudicial to the general maritime law, the single state concerned may regulate it without violating the admiralty and maritime jurisdiction of the federal government. *Western Fuel Co.* v. *Garcia,* 257 *U. S.* 233; 66 *L. Ed.* 210; *Just* v. *Chambers,* 312 *U. S.* 383; 85 *L. Ed.* 903. Likewise, if the local subject-matter in question does not extend unduly into the affairs of other states, so that it will not be subject to multifarious regulation, that one state may, in the absence of federal legislation, tax that subject-matter and thus require it to bear its "just share of the state tax burdens" without violating the jurisdiction of the federal government over interstate and foreign commerce. *Cf. McGoldrick* v. *Berwind-White Coal Min. Co.,* 309 *U. S.* 32; 84 *L. Ed.* 565.

True, in the case of *Southern P. Co.* v. *Jensen, supra,* the court held that the *New York* Workmen's Compensation Act was unconstitutionally applied to a longshoreman killed while unloading a ship owned by a *Kentucky* corporation and engaged in *interstate commerce only.* In the instant cases, however, as we have seen, claimants are confined to work which is performed entirely within the territorial limits of our state. They do not enter foreign lands nor the waters nor ports of sister states. Contrary to the situation in the Jensen case, the employers in the instant cases cannot object to state regulation on the ground that if New Jersey can subject them to such regulations "other states may do likewise." Here, the business is sufficiently localized to avoid the dangers and liabilities of multifarious taxation. *Cf. Alaska Packers Association* v. *Industrial Accident Commission,* 276 *U. S.* 467; 72 *L. Ed.* 656, wherein Mr. Justice McReynolds held that an employe who was injured while performing service in connection with a fish canning business might recover under a state Workmen's Compensation Act because "* * * he was not engaged in any work so directly connected with navigation and commerce that to permit the

rights of the parties to be controlled by the local law would interfere with the essential uniformity of the general maritime law. The work was really local in character." *Cf. Sunny Point Packing Co.* v. *Faigh,* 63 *Fed. Rep.* (*2d*) 921 (a case which, on the facts, is very, very similar to ours and in which Judge Mack applied the Alaska Compensation Act); *Union Oil Co.* v. *Pillsbury,* 63 *Fed. Rep.* (*2d*) 925 (in which Judge Mack summarizes the law and discusses the Faigh case).

Nor is such a finding inconsistent with our holding in *March* v. *Vulcan Iron Works,* 102 *N. J. L.* 337; 132 *Atl. Rep.* 89 (where the foreman of a boiler shop was killed while working on a vessel that had been completed and placed in commission); *Tuccillo* v. *Clark & Son,* 104 *N. J. L.* 122; 139 *Atl. Rep.* 58 (where a stevedore was injured during the course of loading of a ship); *Davey* v. *Delaware, Lackawanna and Western Railroad Co.,* 105 *N. J. L.* 178; 143 *Atl. Rep.* 313 (where a pipefitter was injured while engaged in the repair of a vessel); *Rogisich* v. *Union Dry Dock and Repair Co.,* 106 *N. J. L.* 591; 150 *Atl. Rep.* 670 (where a carpenter was injured while engaged in the repair of a vessel). In each of those cases we have held the state had no jurisdiction to apply its Workmen's Compensation Law. In each of them, the employee was injured while working on a vessel which had already been built and had engaged in maritime navigation. As expressly pointed out by Mr. Justice Parker in the March case "a distinction is drawn between the case of a workman on a vessel in course of construction and one working on a vessel previously completed and placed in commission." In each of the above cited cases, the vessel, once it entered into navigation, came within the exclusive federal jurisdiction where uniformity was necessary. The situation in the instant case, however, is to be distinguished therefrom. The business in which the claimants are employed has always been, and must, of necessity, always remain local and attached only to our state. As such, it is properly subject to the state police power. *Cf. Sunny Point Packing Co.* v. *Faigh, supra; Just* v. *Chambers, supra.* We so hold.

The judgment below in each case is affirmed, and the writ in each case is accordingly dismissed, with costs.