CAPE GIRARDEAU SAND COMPANY, Appellant, v. UNEMPLOYMENT COMPENSATION COMMISSION and JOSEPH C. MAEVERS.—No. 39140.—184 S. W. (2d) 605.

Division One, January 2, 1945.

*Rush H. Limbaugh* for appellant.

*Edward D. Summers,* Acting Chief Counsel, for respondents; *George A. Rozier* of counsel.

BRADLEY, C.—This cause was commenced by appellant (employer) to review an award of unemployment compensation benefits to Joseph C. Maevers, claimant. The trial court affirmed the finding of the Commission and the employer appealed. Jurisdiction of the appeal is in the supreme court. See A. J. Meyer & Company v. Unemployment Compensation Commission, 348 Mo. 147, 152 S. W. (2d) 184; Trianon Hotel Co. et al. v. Kietel et al., 350 Mo. 1041, 169 S. W. (2d) 891.

Claimant was employed by appellant in 1939 and 1940. Appellant contends that claimant was not entitled to compensation benefits for

two reasons: (1) Because the labor performed by claimant was as a "member of the crew of a vessel on the navigable waters of the United States", and by Sec. 9423 (i) (6) (3) R. S. 1939, is exempt from the unemployment compensation law prior to amendment in 1941, Laws 1941, p. 566; and (2) because claimant quit the employment of appellant voluntarily and without good cause and should be denied compensation benefits for that reason.

■ Was claimant a member of the crew of a vessel on the navigable waters of the United States? Appellant conducts a sand business at ·Cape Girardeau, Missouri. The sand is obtained from the Mississippi River. The equipment used in getting the sand from the river consists of a tow boat, and what may be termed a dredge barge, a carrying barge, and a derrick barge. The dredge barge has on it a steam boiler and engine and sand pumping equipment; the derrick barge has on it a derrick and also a steam boiler and engine. The work is carried on in this way, as we understand the record. The dredge barge and carrying barge are towed by the tow boat to whatever place in the river is desired. The derrick barge remains tied up at the shore where the sand is loaded onto cars or placed on the bank. The dredge barge equipment pumps the sand from the river, and the carrying barge, towed by the tow boat, carries the sand to the derrick barge at the bank.

Claimant, interrogated by the referee, testified: "Q. What kind of work did you do? A. Fired the dredge and derrick. ■ Q. When you say that you mean—? A. Fired the dredge when loading sand and the derrick when unloading sand. Q. Just what do you mean by firing the dredge and derrick? A. Well, keeping the steam up. Q. You kept up stream? That is coal operated? A. Yes. Q. And you kept the boilers in sufficient steam to operate the dredge and derrick, is that correct? A. Yes, sir. . . . Q. How did you get out on the river? A. Well, they got a boat there (the tow boat). I don't know whether it was leased or hired or what. Q. Did you assist in the operation of that boat (the tow boat)? A. I have helped make up tow on it. Q. You mean by that that you handled lines to attach the tow to the barge? A. Yes, sir. Q. Did you work on the barge? A. Well, I did work on the barge part of the time unloading. Q. But you did work on the dredge itself, is that it? A. Yes, sir."

Interrogated by Mr. Limbaugh, counsel for the employer, claimant testified: "Q. Your work for the Sand Company consisted largely of your working connection with the sand boat on the river? A. Yes, most of the work was on the river. Q. Now, in addition to that, you did some work for them on the farm, didn't you? A. That's right. Q. Do you know about how much work you did on the farm? A. No, I couldn't say. That is, in the run of 1940. Q. In 1940, possibly a month or two? A. Yes, I would say, not for a fact, but at least something like that. Q. Now, when you were not working on the farm,

you did this work on the sand boat? A. Yes, sir. Q. Did you do any other work around the place besides that? A. Well, sometimes there would be small jobs on the bank, like going up and cutting the cable or some job either— Q. But by far and large, the most of your work was on the river itself on the boat? A. That's right. Q. Now, when you unloaded the sand, you did that by the operation of the crane? A. Derrick, yes, sir. Q. Derrick—and where was it placed? A. You put in on the bank, on the river there. Q. It is on a barge, is it? A. Yes, sir. Q. Did you assist in the operation of that derrick in the unloading of sand? A. Well, just not all the time; part of the time on the barge and then part of the time I was firing there.''

A. J. Schumacher's claim for compensation benefits was heard before the referee at the same time claimant was heard, and the two claims were consolidated. Schumacher and claimant did similar work for appellant and the evidence as to Schumacher's claim is in the record. Schumacher testified about as claimant did, so it will not be necessary to set out his evidence.

Leonard Deimund, superintendent of appellant, interrogated by Mr. Limbaugh, testified: ''Q. Now, in connection with Mr. Schumacher's claim, you have heard the testimony here? A. I have, sir. Q. I will ask you if you have any further statement to make for the record relative to the nature of his employment that tends to support your contention that he is exempt under the terms of the Act? A. Well, I would like to know about what percentage of the work he claims he performed on the bank, and what percentage on the river. Q. He has testified about that. Will you go ahead and tell me what you know about his work and what part was performed on the barge or boat and what part was performed on the shore? A. He was employed last fall as deckhand and member of crew. He helped us dredge and unload sand. Once in awhile there would be a breakdown or something like that, and the barge would have to be repaired, take an hour or so to do it, but I would say 95% or more was actually performed on the water. Q. And when he was working on the water, just what was he doing? A. Deckhand work. Q. Deckhand work? And that was performed on what kind of a vessel? A. Well, it was on a barge and on a dredge and a small towing vessel. He helped handle the lines and make up loads, level sand by use of a shovel, tie the lines up on the bank. Just do general work in connection with operation of the base of a barge. Q. Well, now, in connection with this work for which he was employed, will you state what kind of equipment you used? A. Well, combination steam and coal dredge. We used wood to haul the derrick, floating down for unloading, and took the sand off the barge. Q. Now, where do you keep that equipment? A. We have a plant in Cape Girardeau. Q. Do you know about what part of the time you operate your sand pumping equipment? A. We use a dredge about once before noon and once in the afternoon. It takes

a little longer to dredge sand than unload. You spend more time coming and going than unloading. Q. How far up and down the river do you go in pumping? A. Well, various parts of the river, and I would say his work was probably all covered within a mile from the plant. One time we made a trip up above Devil's Island, which is about five or six miles. Q. Now, in the process of unloading the sand, what did Mr. Schumacher do? A. Well, he worked on the barge, handled lines, dropped the barge down, things like that.

. . .

"Q. Now, relative to Mr. Maevers' employment, Mr. Deimund, will you describe the nature of the work he performed for you while he was in your employ? A. Well, it is practically the same as Mr. Schumacher's, except he fired instead of doing all barge work. Part of the time he was barging down lines, sometimes he would level up the sand. Sometimes there was nobody out there but just he and I on the dredge. I handled my part of the work and he handled his. Both of us handled lines. Q. Now, what part of the time would you say, when in your employ, would you say he was engaged in the work for the sand company, was he engaged on the barge or on the boat or which other work out on the river? A. Well, we were engaged mostly out in the river. When he helped unload, sometimes he helped work out on the barge, I think probably six to seven hours out of every ten was actually performed out on the river. Q. Now, the balance of the time, you say six to seven hours were spent on the river, now where did he work the balance of the ten hours? A. Well, he would be on the barge or on the dredge. Sometimes he fired the dredge and sometimes he worked on the barge.''

The Commission made the following finding which is, in part, reflected in our statement, supra.

"During 1939 and until October 21, 1940, the claimant was employed by the Cape Girardeau Sand Company, an employer, as defined in the unemployment compensation law, in connection with its business of taking sand from the Mississippi River near Cape Girardeau. The method employed by the Cape Girardeau Sand Company to carry on its business is as follows: A barge, upon which is located an engine and pumping equipment, is towed out into the Mississippi River by a tow boat where it undertakes to pump sand from the bottom of the river on to another barge. This latter barge, after being loaded, is then towed to the shore by the tow boat where the sand is raised by a derrick and pumped into a hopper preparatory to reloading in railroad cars for transportation or on the ground for storage. The claimant performed most of his services during his employment on board the dredge boat and the derrick boat where he fired boilers for the maintenance of steam required for the pumping and derrick operations. The derrick boat is kept tied up at shore during this sand pumping operation. The claimant also performed

some services in connection with the loading of the barge and in handling the lines to make up tow on the dredge boat and barge, as well as some work performed on land in connection with the sand business.''

There is no case in our jurisdiction exactly in point on the facts here. Our statute, Sec. 9423 (i) (6) (3) R. S. 1939, provides that the term employment shall not include ''service performed as an officer or member of the crew of a vessel on the navigable waters of the United States.'' It is conceded that the waters where appellant operated are navigable waters. This language is identical with the language of the New Jersey unemployment compensation statute. The case of Shore Fishery v. Board of Review of Unemployment Compensation Commission et al., 127 N. J. L. 87, 21 Atl. (2d) 634, involved a question somewhat similar to the one here. In the New Jersey case the claimants claimed that they were eligible for benefit payments. The employers resisted on the ground that claimants were members of the crew of a vessel on navigable waters of the United States. The facts were these:

The employers were engaged in catching fish from pound nets set in the Atlantic Ocean within the territorial limits of New Jersey, and in preparing the fish for shipment and shipping them to market. The employers maintained an establishment on shore. In order to catch the fish groups of 8 men each launched boats through the surf. These boats could be propelled by motor or oars. To get through the surf the boats were propelled by pulling on a line attached to poles, one set in the ocean and one on the beach. When the boat was past the surf the motor was used. When the motor was in use only the steersman and the motor operator were necessary to operate the boat. On reaching the nets, from a half mile to two miles out, the engine was stopped and the occupants pulled in the net and fish; repaired the net if necessary, and reset it. On the way back to shore the men worked at cleaning the fish and cleaning up the boat. After landing they removed the fish and sometimes continued to clean and also helped grade. The boats were required to be registered with the Federal government. The men did not sign articles as members of a crew. They could quit at will (all such, we infer, was true as to claimant in the present case). Knowledge of handling rope was the chief duty the men had in common with a seaman. They worked 10 hours per day, and about an hour each day was spent pulling the boat through the surf. The greater portion of their time was consumed moving the boat from point to point at the pound and in handling the nets. The men were not subject to the discipline of a seaman on a vessel at sea. They regarded the man in charge of each group as a boss and not as a *captain* (and so here, we infer); they were under his direction when working on land as well as on water. When maneuvering the boat with ropes each man had assigned duties.

Many cases were reviewed in the New Jersey case, to which review we refer, and it was held that the claimants were not members of a crew of a vessel on the navigable waters of the United States and that they were entitled to unemployment benefits.

The Illinois unemployment compensation statute is also identical with ours as to exempting members of the crew of a vessel, etc. Grant Contracting Co. v. Murphy et al. (Ill.), 56 N. E. (2d) 313 (May 16, 1944), involved the Illinois statute. In the Illinois case several cases were consolidated. The claimants claimed that they were eligible for benefit payments. On the other hand it was contended that the claimants were not covered by the Illinois statute. The facts:

Grant Construction Co. (hereinafter referred to as Grant) was engaged in dredging operations on the Illinois River (navigable waters). Grant was a subcontractor of the McWilliams Dredging Company which had a contract with the United States Government for improving, deepening and widening established navigation channels of the Mississippi River and its tributary rivers. Grant worked on the Illinois River from about 17 miles north of Havana, Illinois, to a point about 17 miles south thereof. In the work Grant used two hydraulic dredges about 100 feet in length and about 26 feet in width. Both were powered by diesel electric units on board. All the dredging machinery was also operated by these units. One of the dredges was documented by the Bureau of Navigation of the Department of Commerce. The documented dredge was self-propelled and could move under its own power. The other dredge required the use of a barge which was furnished power by the diesel unit aboard the dredge. To move this dredge any distance it was necessary to lash it to the barge. In the dredging work the dredge moved about 500 feet in 24 hours. This movement was made by what was termed a spudding process which involved the anchoring of the dredge by wires attached to trees on each side of the river or by wires attached to anchors in the river bed and the use of perpendicular shafts at each corner of the stern of the dredge. Attached to the dredge was a suction line at the end of which was a revolving cutter which cut material from the river bed. The loosened material was sucked up and forced into a 16 inch discharge line to disposal areas on shore or in shallows.

One claimant had charge of the diesel engine and electrical equipment on the dredge; four claimants were oilers. They assisted the lever man; oiled the engine, the hoist, ladder and other machinery; took soundings. One claimant was a motorboat operator who operated an auxiliary boat used in connection with each dredge. This boat was 32 feet in length and was used as a dredge tender in transporting the crew from the dredge, transporting supplies to and from the dredge, etc. One claimant was called a mate and had supervision of the "deck hands or labor." His duties involved the moving of the swinging lines and anchor, opening and closing the pontoon lines, "handling the

anchors on the pontoon lines and the location and maintenance thereof both on the water and on the shore.'' The claimants did not sign Ship's Articles upon entering their employment; they were not licensed seamen; they lived and boarded at home (all such is the inference in the present case).

The question was considered at some length by the supreme court of Illinois and quite a few cases cited and reviewed and the conclusion reached that the claimants were eligible for unemployment compensation benefits. In ruling the question the court said [56 N. E. (2d) 1. c. 318]:

''Without question the primary purpose of the barges upon which the claimants here were employed was the deepening and improving of the navigability of the channel. The movement of the barges was a mere incident to the main purpose involved. No semblance to the ordinary organization of a ship's crew was maintained although nautical terms were used in reference to the various laborers and bosses. These men were engaged in excavation primarily. They worked in eight-hour shifts, they lived on the land and ate and slept at home each night. They had no licenses, had never signed any Ship's Articles and did not in any manner perform services that tended to fulfill the ordinary understanding of navigation. They were only incidentally engaged in the accomplishment of the purpose in the movement of the barge. The language of the court in the Puget Sound case [126 Pac. (2d) 37] is convincing and seems to bear the more logical conclusion. We believe that the purpose of the act was to exclude those from coverage under the Unemployment Compensation Act whose services substantially tended to promote the welfare of the vessel as an agency of navigation.''

In South Chicago Coal & Dock Company v. Bassett, 309 U. S. 251, 60 S. Ct. 544, 84 L. Ed. 732, the court had under consideration the question as to whether a laborer on a lighter barge whose chief duty was to keep coal flowing down a chute to the vessel being coaled was a member of the barge's crew under the Longshoremen's and Harbor Workers' Compensation Act. It was held that the laborer was not a member of the barge crew. The court said: ''This Act, as we have seen, was to provide compensation for a class of employees at work on a vessel in navigable waters who, although they might be classed as seamen [International Stevedoring Company v. Haverty, supra (272 U. S. 50)], were still regarded as distinct from members of a 'crew.' They were persons serving on vessels, to be sure, but their service was that of laborers, of the sort performed by longshoremen and harbor workers and thus distinguished from those employees on the vessel who are naturally and primarily on board to aid in her navigation.''

In Murphy et al. v. Menke, 350 Mo. 145, 165 S. W. (2d) 653, the question was whether actors on show boats were not covered by our

unemployment compensation law because of Sec. 9423 (i) (6) (3) R. S. 1939. It will not be necessary to set out the facts of that case. It was held that the actors were not "members of the crew of a vessel on the navigable waters of the United States." In ruling the case the court quoted with approval from the Puget Sound case, supra, as follows: "In order that the services performed by an individual upon a vessel on navigable waters of the United States be excluded from coverage under the unemployment compensation law, it must be shown that such services substantially tend to promote the welfare of the vessel as an agency of navigation. It is not sufficient only to show that such services are incidental to navigation."

We rule that claimant in the present case was not excluded from benefits by said Sec. 9423 (i) (6) (3) R. S. 1939.

It is conceded that claimant quit his employment without good cause. Should unemployment compensation be denied on that ground? The Commission held that claimant, for quitting his employment without good cause, should be disqualified for benefits "for a five week period beginning with the date October 21, 1940." Sec. 9431 R. S. 1939, Mo. R. S. A., Sec. 9431, among other things, provides: "An individual shall be disqualified for benefits under the following conditions and in each case the weeks of such disqualification shall be deducted from the benefit period and his wage credits charged correspondingly as if benefits had been paid, whether or not such individual obtains other employment during such weeks of disqualification. (a) For the week in which he has left work voluntarily without good cause, if so found by the Commission, and for not more than the four weeks which immediately follow such week, as determined by the Commission according to the circumstances in each case."

Under the facts the Commission assessed the maximum disqualification, as we see it.

It appears that claimant performed some farm labor for the appellant and such labor is exempt from our unemployment compensation law. Sec. 9423 (i) (6) (1) R. S. 1939. However, it appears that the reports to the Commission as to claimant's earnings did not include farm labor.

The judgment should be affirmed and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.