In the Matter of the Claims of ADA E. LAZARUS, VERNA NEWELL, LEONA M. MORLEY, ALTHEA C. JACOBS, MARGARET L. COLEATES, ELIZABETH KINDELBERGER, CATHERINE C. SHIPMAN, BESSIE H. HARVEY, BLANCHE C. STAPE, OLIVE T. COON, MABEL M. PADDOCK, ELSIE L. BAGSHAW and EDITH B. KEY.

EDWARD CORSI, as Industrial Commissioner of the State of New York, Appellant; GEO. W. HAXTON & SON., INC., Respondent.

Argued May 24, 1945; decided October 25, 1945.

*Nathaniel L. Goldstein, Attorney-General (Francis R. Curran* and *Orrin G. Judd* of counsel), for appellant. I. Claimants worked in covered employment. They were not engaged in agricultural labor. Their services were not rendered as "an

incident to the preparation of such fruits or vegetables for market," since the beans had already reached "a market." (*Latimer* v. *United States*, 52 F. Supp. 228; *Lake Region Packing Ass'n* v. *United States*, 146 F. 2d 157; *North Whittier Heights C. Ass'n* v. *National L. R. Board*, 109 F. 2d 76.) II. The beans had reached a "market" when they were sold to respondent. (*Marsh* v. *Titus*, 6 Th. & C. 29; *Foster* v. *Pettibone*, 7 N. Y. 433; *Milliman* v. *Neher*, 20 Barb. 37; *Ketchum* v. *City of Buffalo & Austin*, 21 Barb. 294, 14 N. Y. 356; *Langdon* v. *Mayor*, 59 Hun 434; *Matter of Thompson* [*Sagtikos Farm, Inc.*], 262 App. Div. 792, 288 N. Y. 595.) III. Respondent's services are not rendered by the farmers. (*Chamberlin, Inc.* v. *Andrews*, 271 N. Y. 1; *Minor Walton Bean Co.* v. *Michigan Unemployment Ins. Compensation Comm.*, 308 Mich. 636; *State* v. *Christensen*, 18 Wash. 2d 7; *Park Floral Co.* v. *Industrial Commission*, 104 Col. 350.) IV. The fact that the Industrial Commissioner, in the administration of the law, has interpreted the section under consideration as contended by appellant should be given great weight on the issue herein. (*People ex rel. Public Service Comm.* v. *New York Tel. Co.*, 262 App. Div. 440, 287 N. Y. 803; *Matter of Mounting & Finishing Co.* v. *McGoldrick*, 294 N. Y. 104; *People ex rel. Ray* v. *Martin*, 294 N. Y. 61, 73.)

*George J. Skivington* and *William P. Smith* for respondent. I. Where a State act follows, and, in effect, re-enacts a Federal act, it is desirable that the State follow the Federal statute and its interpretation. (*People ex rel. Mosbacher* v. *Graves*, 254 App. Div. 438; *Matter of Weiden*, 263 N. Y. 107; *Florida Industrial Comm.* v. *Peninsula Life Ins. Co.*, 10 So. 2d 793.) II. Even if the State act did not follow the Federal act and it was being construed *de novo*, it must be interpreted to exempt the appellant's bean pickers. (Labor Law, § 511, subd. 6, par. [4]; *Carstens Packing Co.* v. *Industrial Accident Board*, 123 Pac. 2d 1001; *Bott* v. *Unemployment Compensation Division of Industrial Acc. Bd.*, 123 Pac. 2d 1004; *Mulanix* v. *Falen*, 130 Pac. 2d 866.)

LEWIS, J.   The thirteen employees who by this proceeding would enforce their claims for unemployment benefits under article 18 of the Labor Law (commonly known as the Unemployment Insurance Law) were employed in 1941 by the respondent as " bean pickers." The operation of bean picking, as that phrase is used in this proceeding, is not descriptive of the removal of beans from the vines. It is a culling process by which dirt and waste are removed manually by employees who are stationed at a moving belt upon which the mass of beans passes for inspection. The claimants' right to unemployment benefits which they now assert for a period of unemployment commencing in June, 1942, depends upon whether their prior employment by the respondent in 1941 was " agricultural labor " which is expressly excluded from the coverage of Labor Law, section 502, subdivisions 1 and 11.   (L. 1941, ch. 669.)*

The material provisions of the statute are as follows:

Section 502, subdivision 1 " * * *   *for the purposes of this article, ' employment ' shall not include: (1) agricultural labor;* * * * ,"

Section 502, subdivision 11 " *The term ' agricultural labor ' includes all service performed* * * *

" (4) *In* handling, planting drying, packing, packaging, processing, freezing, grading, storing, or *delivering to* storage or to *market* or to a carrier for transportation to market, *any agricultural* or horticultural *commodity; but only if such service is performed as an incident to farming operations or in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market.* The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural * * * commodity after its delivery to a terminal market for distribution for consumption." (Italics supplied.)

The Unemployment Insurance Appeal Board, upon its affirmance of the referee's decision, determined that the claimants

---

* The statute is now Labor Law, section 511, subdivision 6, paragraph (a), clause (4) (L. 1944, ch. 705).

were not engaged in " agricultural labor " and accordingly awarded them unemployment insurance benefits based upon their earnings in such employment. The Appellate Division (one member dissenting) reversed the decision of the appeal board and ruled that the claimants were engaged in " agricultural labor " within the definition of the statute which denied them the unemployment insurance benefits previously awarded.

We are to determine whether within the language of the statute the " service " rendered by the claimants as bean pickers was performed " as an incident to the preparation of such " beans " for market."

The facts are undisputed and may be taken from the decision of the appeal board. The respondent corporation, to which reference will be made as the employer, deals in farm produce. In its employ were more than sixty bean pickers among whom were the thirteen claimants. On April 22, 1941, the employer discontinued its former practice of including bean pickers in its quarterly payroll reports upon which were based its contributions to the State unemployment insurance fund. Those employees were omitted upon the theory that the service performed by them as " bean pickers " comprised " agricultural labor " as defined by section 502, subdivision 11, paragraph (4) of the Unemployment Insurance Law (effective April 22, 1941) which service was excluded from unemployment insurance coverage. The employer neither owns nor operates a farm. It buys beans in bulk from various growers. When the beans have been cleaned and graded they are packed in one hundred pound bags on which appear the employer's name. They are then sold by the employer at wholesale to canners and jobbers.

In the operation of its business the employer owns or leases a number of " bean elevators " equipped with machinery to remove culls and waste material from the dried beans as received by the employer from the growers. To perform that service, as described in the decision of the appeal board, " Claimants and the other bean pickers similarly employed are furnished by the employer with separate bean-picking belts. Each bean

picker sits alongside of her belt and, as the beans pass in front of her, picks out by hand the culls or offal.'' The evidence is not disputed that on every sale of beans by a grower to the respondent employer *there is deducted from the price paid the grower the cost of cleaning the beans,* viz., the cost of the service performed by claimants and the other '' bean pickers.'' Unless the beans are cleaned and graded — as found by the appeal board — '' the employer would be unable to sell the choice hand-picked beans to its customers.''

It is important to note that there is no evidence of record that there was any market for the beans in the condition in which they were when received by the employer from the grower. To say — as does the appellant — that the grower sold unpicked or uncleaned beans to the employer and that such sale created a '' market '' within the language of the statute is to disregard the actual transaction between the grower and employer. The sale by grower to employer was of beans *after* they were cleaned. That conclusion follows from the undisputed evidence that *the cost of cleaning the beans was deducted from the price paid by the employer to the grower.* The beans were not marketable until *after* the service rendered by the claimants had been performed, the cost of which was borne by the grower.

The State enactment with which we are concerned was adopted in strict conformity with earlier Federal legislation (Federal Insurance Contributions Act, U. S. Code, tit. 26, § 1400 *et seq.,* and the Federal Unemployment Tax Act, U. S. Code, tit. 26, § 1600 *et seq.*). The history of the legislation shows an intent to exclude from the operation of the statute all '' agricultural labor,'' whether the service is performed directly by the farmer who has machinery adapted to that operation, or by a third party in behalf of the farmer who lacks machinery essential to prepare the product for market. If, as the appellant contends, the term '' market '' as employed in the statute is to be restricted to the initial sale by the grower to the employer, the market thus created would relate to the sale of picked or cleaned beans, — not the product delivered by the grower to

the employer before the bean-picking service has been performed.

Borrowing from the language of the statute to phrase our conclusion — the claimants were engaged in " agricultural labor " inasmuch as the " service " they performed was rendered " as an incident to the preparation of such " beans " for market."

The order should be affirmed, with costs.

CONWAY, J. (dissenting). The Industrial Commissioner has appealed from an order of the Appellate Division, which reversed a decision of the Unemployment Insurance Appeal Board and determined that claimants were engaged in " agricultural labor " as defined in Labor Law, section 502, subdivision 11, paragraph (4). We must determine whether the Appellate Division or the Unemployment Insurance Appeal Board was correct in its construction of the section and subdivision.

The facts are undisputed. The respondent (hereinafter referred to as Employer) is a domestic stock corporation engaged in the business of buying and selling farm products, including beans, hay, grain, fresh fruit and vegetables. It purchases the fruits and vegetables from farmers who plant, grow and harvest them. Employer owns or leases eighteen to twenty buildings or elevators to house the processing, elevating, and storing of the farm products in which it deals. Each elevator is located upon a railroad siding within the corporate limits of a village and has no connection with any farm land. In each of its buildings, Employer has installed mechanical devices essential to the processing of the agricultural products in which it trades including elevating, grading, polishing and grinding machinery. Through its twenty to twenty-five branches and its eighteen to twenty elevators, during the year 1942, Employer conducted fifty-eight separate operations in connection with its trading in farm products. One of the processes is " bean picking ". The machinery used is installed in the bean elevator. The machinery is owned by Employer, and each

bean picker is furnished with a separate bean-picking belt. She sits beside the belt and as the beans pass before her, she picks out by hand the culls or other waste materials, which become the property of Employer and are resold by it. The number of " bean pickers " ranges from sixty to sixty-five.

All of the bean pickers are hired by Employer. Their work is seasonal in character, and they are intermittently laid off and rehired throughout the calendar year. Employer pays the bean pickers and supervises, directs and controls all of their activities, which are concededly physically unconnected with the actual cultivation of the soil or the raising and maturing of the beans.

The beans raised by the farmers are either brought to Employer's elevators by the farmers' trucks or by trucks furnished by Employer. In the latter case, a charge is made for the hauling.

Generally, a sale by the farmer to Employer is handled as follows: When a load of beans reaches one of the elevators, the beans are unloaded, run through the grading machine (to remove small off-grade beans and all the dirt), then through a hopper and weighed. Then a " sample pick " is taken and weighed. The percentage of culls is figured upon that sample, and that percentage is deducted from the total purchase. Thus: " If it were a two percent pick, our sample would show that two pounds out of every hundred are going to be culls. The farmer's lot would be deducted on a two percent basis." The " sample pick " and the result shown by it does not affect the price put upon the " scale ticket." It affects the weight. The price is the fixed price on 100 pounds of beans. On the " scale ticket " there is also the word " condition." If the beans are a certain percentage off-condition — say 5% — that 5% is deducted from the gross weight and the farmer is paid for the net. Again, that has nothing to do with the market price as fixed on the ticket. The " scale ticket " is in form as follows:

. " Geo. W. Haxton & Son, Inc.               No. 35495

.............................. Date........... 194..

Bought from.......................... Gross......

Commodity .......................... Tare.......

Price ............................... Net........

Condition ...........................................

Weigher....................... "

There are some variations of method, but it is conceded that
nothing turns upon such variations. In about 95% of the cases,
the beans which come in are commingled and picked irrespective
of the producer or grower.

After the farmer has received his receipt, showing the gross
and net weight of the beans, with deduction for condition, he
brings the ticket to the branch manager in charge of the station.
That manager transfers the information shown on the " scale
ticket " to a slip, computes the value of the good beans and
sends the ticket and slip to the home office. From there, a
check is mailed direct to the farmer.

After the " sample pick " the threshed beans are elevated
to storage bins, from which they pass down and over the picking
tables to be hand picked into grades. After hand picking, the
beans are packed by Employer in 100 pound bags, upon which
Employer's name appears. Employer resells to jobbers and
canners. It also sells the culls or unwanted beans to farmers
as feed for hogs, cattle and chickens. Its profit is the difference
between the price paid by it to the farmers and the resale price,
less the costs incident to the operations conducted by Employer.
The price at which Employer sells the product and his profit
are matters in which the farmers have no interest and take
no part. Employer carries fire and wind-storm insurance upon
the contents of its elevators. The farmers have no interest
therein and are not named as beneficiaries. Employer covers
its employees, including claimants, under the Workmen's Com-
pensation Law and carries insurance for that purpose.

The following is the statute to be construed, insofar as
pertinent here. It is section 502, subdivision 11, paragraph (4)

as enacted by Laws of 1941, chapter 669, effective April 22, 1941: " 11. The term ' agricultural labor ' includes all service performed * * * (4) In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; but only if such service is performed as an incident to farming operations or in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption."

We must determine whether the service performed by Employer was an incident to the preparation of the beans *subsequent* to their arrival at the *farmer's market* because if the beans had already reached the market which the Legislature had in mind in its use of the words " as an incident to the preparation of such fruits or vegetables for market," then the labor of the bean pickers, the claimants here, was not included in the term " agricultural labor." The Industrial Board decided that the quoted paragraph of the subdivision did not exempt from coverage bean pickers such as claimants, employed by a commercial stock corporation which grew no beans or other agricultural product, and who performed their services at a railroad siding in a bean elevator, unconnected with any farm. The board also held that the term " preparation for market " meant preparation for the *farmer's market* and that that market is the place where the farmer finally disposes of his farm product by transfer of title which, in this instance, is the office of Employer. The majority of the justices of the Appellate Division, on the contrary, were of the opinion that the phrase in the statute " as an incident to the preparation of such fruits or vegetables for market " meant " a terminal market ", thus disregarding the careful differentiation by the Legislature between the term " market " as used in the quoted

subdivision on three occasions and the term " terminal market " which is used but once.

We think that the simple and clear-cut rule which the Industrial Commissioner has formulated and used in applying the words of the statute to the facts presented here is the proper one. It is certain and easy of operation and is readily applicable to the only two situations which may arise. That rule is as follows:

(1) Where the title to the fruits or vegetables passes from the farmer who produced them to an entrepreneur, the exemption ceases at the time of the transfer of title.

(2) Where the farmer operates a commercial canning or commercial freezing establishment, services rendered therein are not exempt, even if performed by employees of the farmer. If he operates a terminal market used for the distribution of the farm produce for consumption, the service with respect to that produce ceases to be exempt upon its delivery to such terminal market, even though such service is performed by employees of the farmer-producer.

The rules framed by the Industrial Commissioner accurately reflect the historical development, both in New York and the nation, of unemployment insurance statutes which led to the present exemption of " agricultural labor ". The original enactment of article 18 of the Labor Law, entitled Unemployment Insurance Fund, was in Laws of 1935, chapter 468, effective April 25, 1935. Section 502 of the statute (Labor Law) provided that " * * * ' employment ' shall not include: (1) employment as a farm laborer; * * *." The term " farm laborer " was not defined. About four months after the enactment of that article, the Federal Social Security Act, chapter 531 (Public No. 271, 74th Congress, approved Aug. 14, 1935) was enacted. Those provisions are now contained in the Federal Insurance Contributions Act, United States Code, title 26, section 1400 *et seq.* and the Federal Unemployment Tax Act, United States Code, title 26, section 1600 *et seq.* " Agricultural Labor " was excluded from coverage but was not defined. The Treasury Department, charged with the collection of the taxes

under the Social Security Act, promulgated Regulations 90 and 91 under Titles VIII and IX of the Act, defining " Agricultural Labor ".

Under those regulations, Federal agencies administering the act ruled in effect that if farmers sent their fruits and vegetables to a " cooperative " for cleaning, grading, packing or packaging, the employees of the co-operative came within the provisions of the Federal statutes and the employer co-operative was required to pay a tax with respect to their wages although if the same services had been performed on the farm by employees of the farmer, such services would be exempt. (See Congressional Record 76th Congress, 1st Sess. H. R., vol. 84, part 6, pp. 6864–6865.)

Apparently to bring our State act into conformity with the Federal regulations mentioned, section 502 of the Labor Law was amended by Laws of 1939, chapter 762, so as to define " farm laborer ". Under that amendment, which need not here be quoted, the services to be exempt had to be performed on a farm by an employee of the owner or by a tenant of a farm, or, if not performed on the farm, had to be carried on as an incident to ordinary farming operations as distinguished from manufacturing or commercial ones. That interpretation was sustained by the courts. (*Latimer* v. *U. S.*, 52 F. Supp. 228; *Lake Region Packing Ass'n* v. *United States,* 146 F. 2d 157.)

That was the situation which caused further amendments by Congress and by our State Legislature so as to redefine the term " agricultural labor ". The reason was that discrimination had resulted as against small producers of fruits and vegetables who did not have sufficient capital to install upon their farms the machinery necessary for cleaning, grading, processing and packaging their fruits and vegetables and in favor of the large producers who were financially able to install on their farms the necessary machinery and to have the appropriate services performed on their farms by their own employees. The latter paid no tax with reference to such services. The small producers sent their fruits and vegetables to local co-operatives for the rendition of similar services and since those

employer co-operatives were required to pay taxes for the benefit of their employees, the net price received by the small producers was decreased by the amount of the taxes paid. The small farmer thus received less for his farm products than the large producer.

To remedy that Congress amended the Federal statutes to define " agricultural labor " and the definition will be found in Federal Insurance Contributions Act, section 1426, subdivision (h) (U. S. Code, tit. 26, § 1426, subd. (h); 53 Stat. 1383, 1400) and in Federal Unemployment Tax Act, section 1607, subdivision (1) (U. S. Code, tit. 26, § 1607, subd. 1; 53 Stat. 1392).

That relieved farmers who graded and processed their fruits and vegetables at local co-operatives since the latter were relieved of the tax burden. The farmers, of course, *retained title* during the grading and processing. The purpose was not to make the term " agricultural labor " cover services by an entrepreneur entirely disassociated from a farm and who *took title* to the produce from the farmer prior to the processing.

Following the congressional amendments, our Labor Law was amended by Laws of 1940, chapter 837, so as to define the term " farm laborer ", as contained in Labor Law, section 502, in language almost identical with the definition of " agricultural labor " in the amendatory Federal statutes to which reference has just been made. The first time the expression " agricultural labor " was used by our Legislature was in Laws of 1941, chapter 669, and again the definition was substantially the same as in the aforesaid amendatory Federal statutes.

In the Federal statutes and in the paragraph numbered (4) in subdivision 11 of section 502, quoted (*supra*), it is clear that Congress and the Legislature had in mind, and differentiated between, a " market " and a " terminal market." That was not accidental but studied and deliberate. The word " market " is used thrice and the term " terminal market " but once. We must determine the meaning of " market." The Industrial Commissioner and the Attorney-General contend that it means the farmer's market and that when the beans, as here, were sold

by the farmer to Employer and title passed, they had at that moment reached their "market." That disposes, as far as we are concerned, of Regulation 106 of the Commissioner of Internal Revenue issued by authority of section 1429 of the Social Security Act (U. S. Code, tit. 26, § 1429) since that referred to the "cleaning of beans as an incident to their preparation for market", regardless of by whom the service was performed. Here as we have pointed out, the services were performed after the beans had reached the farmers' market.

There has been no Federal court decision affecting the language under consideration here since the Federal amendments of 1939 and no decision by the highest court of any State affecting similar language.

It is not necessary to consider at length definitions of the word "market." Suffice it to say that the "phrase *to market,* has a definite and well understood signification, and means *to sell.*" (*Milliman* v. *Neher,* 20 Barb. 37, 40; see, also, *Ketchum* v. *The City of Buffalo,* 21 Barb. 294, 298, affd. 14 N. Y. 356; *Langdon* v. *Mayor, etc., of New York,* 59 Hun 434, 437; Webster's New International Dictionary [2d ed.].) We now turn to the term "terminal market." It is the ruling of the Industrial Commissioner that the term relates to a market operated by the farmer, wherein he distributes his products for consumption by the public. Thus if a farmer who raises fruits and vegetables upon his farm brings them, after the harvest, to a retail market operated by him in a nearby village or town, even though he retained title, the services of his employees are exempt only until his produce reaches that "terminal market." Thereafter, such services are not exempt, even though performed by the employees of the farmer. (See *Matter of Thompson (Sagtikos Farm, Inc.),* 262 App. Div. 792, affd. 288 N. Y. 595.)

We must not lose sight of the distinction between finished food "products" and finished "farm products" as defined in Agriculture and Markets Law, section 2, subdivision 3, and section 245, subdivision 1. A "market" is a place where finished farm products are purchased and sold. A "terminal market for distribution for consumption" is a place where finished food products are offered for sale for distribution to

consumers. It is well to note at this point also that service rendered with respect to farm products in connection with commercial canning or commercial freezing carries no exemption, although performed by the employees of the farmer. The reason, as made clear by the statute, is that the farmer is not then having service performed " as an incident to farming operations ". Since those services are not exempt, any more than service with respect to products after their delivery to a terminal market operated by the farmer, there can be no basis in reason or statutory language for the contention of Employer that the services of bean pickers, as employees of an entrepreneur entirely and completely disassociated from farming activities, are exempt. The invalidity of Employer's argument is made more marked when we note that Employer is also engaged in quick freezing of fruits at three of its plants. The statutes were clearly aimed at relieving farmers while engaged in ordinary farming activities and while still the owners of their products. The illogical results flowing from the interpretation of the statute sought by Employer are pointed out in the opinion of the learned Justice who dissented below. It seems to us that the statutory declaration of the public policy of this State (Labor Law, § 501, formerly § 500) forbids such an interpretation as to these seasonally employed claimants. We have had occasion recently to point out that an official ruling by a State or city administrative office is entitled to great weight, unless manifestly incorrect, in connection with the application of a statute to a particular set of facts. (*Matter of Mounting & Finishing Co.* v. *McGoldrick*, 294 N. Y. 104, 108.) That is particularly true in a case of novel court impression after a full and complete trial.

The order of the Appellate Division should be reversed, with costs, and the decision of the Unemployment Insurance Appeal Board confirmed.

LOUGHRAN, Ch. J., DESMOND and THACHER, JJ., concur with LEWIS, J.; CONWAY, J., dissents in opinion in which DYE, J., concurs; LEHMAN, Ch. J., deceased.

Order affirmed.