E. H. JANSSEN, doing business as Pathfinder Potato Company, CHARLEY JONES, doing business as Jones Produce, HERBERT CAMPBELL, doing business as The Herbert Campbell Company, E. L. BRESSLER, doing business as Yellowstone Potato Company, and WESTERN PRODUCE COMPANY, a partnership,

*Plaintiffs and Respondents,*

vs.

EMPLOYMENT SECURITY COMMISSION OF WYOMING, and DAVID B. GILFILLAN, BRYAN KEMMER and CHESTER P. SORENSEN, as members of said Commission,

*Defendants and Appellants.*

(No. 2385; April 13th, 1948; 192 Pac. 2d. 606)

For the Defendants and Appellants, the cause was submitted upon the brief of Hon. Norman B. Gray, Attorney General, of Cheyenne, Wyoming, and James G. McClintock of Casper, Wyoming, and oral argument by Mr. McClintock.

For the Plaintiffs and Respondents, the cause was submitted upon the brief and also oral argument of Erle H. Reid of Torrington, Wyoming.

## OPINION

BLUME, Justice.

This is an action brought by the plaintiffs against the Employment Security Commission of Wyoming to recover taxes paid under protest. The Commission claims that the taxes were properly collected under the so-called Wyoming Employment Security Law, Sec. 54-101, Wyo. Compiled Statutes of 1945, and subsequent sections, particularly under Secs. 2 and 7 of the Act, which provide that employers shall pay taxes equal to a stated percentage of the wages paid to employees, with certain exceptions hereinafter mentioned. The plaintiffs claim that they are exempt from the payment of any tax under that Act. The facts in the case stipulated by the parties are, so far as necessary to be mentioned here, as follows:

For many years past, the plaintiffs have been engaged in the business of buying, processing, and selling potatoes and for the purposes of their business have owned and operated sorting machines, warehouses, plants and equipment. In addition to this business some of the plaintiffs grew potatoes upon farms operated by them either as tenants or owners, and process the potatoes grown by them in the same manner as those processed for other farmers.

The growing of potatoes is an important part of farming operations in the vicinity in which plaintiffs operate; the potato crops grown are harvested and placed in half-sacks by the farmers themselves, but as harvested and sacked are not marketable; to make the potatoes marketable they must be sorted and processed; the original sorting is done sometimes on the farms where they are grown and sometimes at the processing plants of plaintiffs for the purpose of eliminating the unmarketable portion of the crop consisting of small potatoes and "culls" and for the further purpose of

determining what portion of the crop is marketable.

The procedure in the processing of potatoes, after the original sorting, consists of resorting, grading, washing and sacking in even-weighed sacks, which processing is done at the warehouses and plants of plaintiffs.

In some instances, depending upon whether or not the individual has storage facilities on his farm, the original sorting is done on the farm upon which the potatoes were raised, and in cases where the farm storage facilities are lacking or are inadequate, the farmer's entire crop is removed by the plaintiffs to the processing plants and are there sorted; in some instances the entire potato crop is removed to plaintiffs' warehouses and after being processed are purchased by plaintiffs from the farmers as the farmer's convenience may dictate.

All the work in connection with the handling of the potatoes after they have been harvested by the farmers is done by men employed by the plaintiffs working under their direction and paid by them, and none of this work is done either by the farmer himself or by his employees; the original sorting is done by means of sorting machines owned by the plaintiffs, and of the cost value of approximately $400.00 to $700.00 and a crew of about 6 to 8 men is employed by plaintiffs in this operation; the equipment at the plants of the various plaintiffs ranges in value from $3000.00 to $6000.-00 and the number of men employed in the course of the processing operations is approximately 18 or 19.

Except for the potatoes raised by the plaintiffs on their own farms, all the potatoes processed are purchased by plaintiffs from farmers in the vicinity in which the processing plants are located under informal oral contracts, and at a price agreed upon between the

plaintiffs, and at a price sufficient to recompense plaintiffs for the original sorting process by which unsalable potatoes are eliminated and the unmarketable portion of the crop determined; the potatoes grown upon the farms of the plaintiffs who themselves raised potatoes and the potatoes purchased by plaintiffs from other farmers are inter-mingled and processed at the same plant, at the same time, and by the same processing crews.

Plaintiffs also handle a comparatively small quantity of potatoes on consignment, in which case the farmer delivers the potatoes from the field as harvested and after plaintiffs have processed them, they are sold, plaintiffs deducting from the sale price the expenses of processing, packing and a brokerage charge, and the balance is paid to the farmer.

It appears herein that the total taxes sought to be recovered is the sum of $5049.97. Of this amount $407.21 was paid on wages paid by processors of potatoes in connection with crops raised by themselves, and $4642.76 was paid on wages paid by the plaintiffs to employees in connection with processing potatoes for customers; that is to say, for other growers. Further, the sum of $1336.06 was paid on the basis of wages paid to employees in processing potatoes on farms, and the sum of $3336.70 on the basis of wages paid to employees processing potatoes in the plants of the plaintiffs off the farms.

Plaintiffs claim that even if no exemption from taxation exists in connection with some of the labor employed in processing in plants, it exists at least in connection with the labor employed in processing potatoes on the farms, and in connection with the labor employed by them in processing potatoes raised by themselves.

I. Historical Setting.

The history of the legislation taxing employers in so far as applicable here is interesting, and sheds much light upon this case. The Wyoming Employment Security Law was enacted as a complementary act to the Social Security Law of the federal government. It was first enacted by Chapter 113, Session Laws of Wyo., 1937. That act provided that the term employment shall not include "agricultural ranch, or dude ranch labor which includes all classes of ranch labor". The act was amended by Chapter 96, Session Laws of Wyo., 1941. It did not contain any general exception of agricultural labor, but merely provided, so far as applicable here, that the term employment shall not include "services performed in the employ of an owner or tenant operating a farm or ranch, in connection with the cultivation of the soil, the harvesting of crops, or the raising, feeding, or management of livestock ,bees, poultry, furbearing animals, and wild life, or in connection with the processing, packing, or marketing of the produce of such farm or ranch as an incident to ordinary farming or ranching operations". That is the statute of this State as it stands at the present time. The validity of this provision is not in any way attacked, and the only question is as to the meaning of that provision.

The federal Social Security Act above mentioned, to which our own legislation is complementary, was enacted on August 14, 1935. That act provided that from the term employment should be excepted "agricultural labor" without defining that term. 42 U. S. C. A. Sec. 1107. The Treasury Department was given the power to make regulations under the act, and pursuant to that power the Commissioner of Internal Revenue made the following regulation:

"Agricultural Labor.—The term 'agricultural labor' includes all services performed—

"(a)   By an employee, on a farm, in connection with the cultivation of the soil, the raising and harvesting of crops, or the raising, feeding, or management of livestock, bees, and poultry; or

"(b)   By an employee in connection with the processing of articles from materials which were produced on a farm; also the packing, packaging, transportation, or marketing of those materials or articles. *Such services do not constitute 'agricultural labor,' however, unless they are performed by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced, and unless such processing, packing, packaging, transportation, or marketing is carried on as an incident to ordinary farming operations as distinguished from manufacturing or commercial operations."* (Italics supplied)

The foregoing regulation is set out in the case of Batt vs. United States, 151 Fed. 2d 949, 950, and in a number of other cases hereinafter mentioned, and will hereafter be referred to as the Federal Regulation. The foregoing regulation has been universally approved as reasonable and valid by the federal courts. Batt vs. United States, 151 Fed. 2d 949 and cases cited. A regulation of similar import made by a state commission has also been almost universally approved as reasonable and valid. See California Employment Commission vs. Butte County Rice Growers Association, 25 Calif. 2d 624, 154 Pac. 2d 892, and cases cited. Commenting upon the effect of the regulation the court in Burger vs. Social Security Board, 66 Fed. Sup. 619, stated as follows:

"If not performed on a farm, the service could not be classed as 'agricultural labor' unless performed 'by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced'."

The effect of the federal regulation is expressed admirably in the case of Wayland vs. Kleck, 57 Ariz. 135, 112 Pac. 2d 207, as follows:

"Our regulations, subdivisions (1) and (2), correspond, in the subject treated, to subdivisions (a) and (b) in the federal regulation and the regulations of other states. The first subdivision refers to one kind of labor, which is always agricultural, and the second subdivision refers to another kind of labor, which may or may not be so classed. In this subdivision the labor is used in processing things grown on a farm, also the packing, packaging, transportation or marketing the things grown or articles made therefrom. These services, if done for the owner or tenant of the farm on which the materials in their raw or natural state are produced and as an incident to the farming operation, as distinguished from manufacturing or commercial operations, are agricultural."

So far as processing, packing and marketing are concerned, the effect of subdivision (b) of the federal regulation above quoted appears to be the same as the Wyoming amendment of 1941. Somewhat anticipating the authorities hereinafter cited, the meaning appears to be this:

If the services are not performed in the employ of the owner or tenant ,no exemption exists; in other words, these services are not considered agricultural in their nature. It would seem to follow that if they are not agricultural, they must necessarily be commercial or industrial. On the other hand, even though the services are performed in the employ of the owner or tenant, they are not necessarily agricultural; they may not be incident to ordinary farming operations, but have reached the stage where they are commercial or industrial in their nature. Subdivision (a) of the federal regulation does not, on its face, require, in order to give rise to an exemption under the law, that the services performed on a farm must be by the employees of the owner or tenant, while the Wyoming amendment of 1941 requires, in order to give rise to exemption under the statute, that the services performed on a farm must be by the employees of the owner or

tenant, while the Wyoming amendment of 1941 requires, in order to give rise to exemption under the statute, that the services performed must in all cases be done "in the employ of an owner or tenant operating a farm or ranch". Whether or not the Wyoming amendment is more restrictive than the federal regulation (a) need not now be determined. Mr. Lynn testified that "the dealers are beginning to get worried that we are going to have to buy potatoes out of the field." It will be time enough to decide the point above mentioned, when the worry passes into actuality. See in that connection Chester C. Fosgate Co. vs. United States, 125 Fed. 2d 775.

In 1939 Congress believed that the exemptions under the then existing law, and the regulation pursuant thereto in connection with agricultural labor should be broadened because "in the case of many of such services, it has been found that the incidence of the taxes falls exclusively upon the farmer, a factor which, in numerous instances, has resulted in the establishment of competitive advantages on the part of large farm operators to the detriment of the smaller ones." See Report 728 of the House Ways and Means Committee 76 Congress 1st Session. So Congress passed an Act on August 10, 1939, effective January 1, 1940, exempting agricultural labor from the term employment by defining the term agricultural labor to include, among others, services:

"(4) In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; but only if such service is performed as an incident to ordinary farming operations or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connec-

tion with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption."

26 U. S. C. A., Sec. 1426. Most of the states thereafter modified their Social Security Act in conformity with the provisions of the federal act. It has been held that under the amended act no tax is due from employers under facts similar to those in the case at bar. Cache Valley Turkey Growers Association vs. Industrial Commission, 106 Utah 1, 144 Pac. 2d 537; Claim of Lazarus, 268 App. Div. 547, 52 N. Y. S. 2d 682, affirmed by an opinion in 294 N. Y. 613, 64 N. E. 2d 169; Unemployment Compensation Commission vs. Unionville Milling Co., 313 Mich. 292, 21 N. W. 2d 135. The legislature of Wyoming, however, refused or neglected, as noticed above, to follow the foregoing trend in legislation, and instead of enlarging exemptions from taxation in connection with agriculture took the opposite course and distinctly narrowed and limited them.

II.   Wages Paid to Employees of Grower-Processor.

The plaintiffs, E. H. Janssen, Western Produce Company and Charley Jones, paid certain taxes herein under protest, based on wages paid to their employees in the processing of their own potatoes, that is to say, potatoes raised by themselves. The Commission claims that these wages were not paid for services incident to ordinary farming or ranching operations. The federal cases hereinafter cited seem to so hold. But we think that this contention cannot be sustained. The laborers employed by plaintiffs in processing their own potatoes were in the employ of owners or tenants as contemplated by the 1941 amendment. So the question remains whether they were employed in "ordinary farming or ranching operations". It has been said that whether the activities in question in this case are inci-

dent to ordinary farming operations, as mentioned in the amendment, or commercial operations, depends on the facts of the particular case, and no definite rule of general application can be evolved. American Sumatra Tobacco Corporation vs. Tone, 127 Conn. 132, 15 Atl. 2d 80. The evidence in this case shows that what was done in this case by the plaintiffs used to be done, until a few years ago, by the farmers themselves. The operations of plaintiffs are comparatively small. We cannot say that they have reached the stage of commercial operations, as distinct from agricultural operations. We are unable to see why the mere use by a farmer of modern equipment to prepare his crop for the market should take his work out of the category of an agricultural operation. In the case of In Re Wenatchee Beebe Orchard Company, 16 Wash. 2d 259, 133 Pac. 2d 283, under a statute similar to the Wyoming 1941 amendment, it was held that an apple grower's packing in his own warehouse adjacent to his farm is agricultural labor, exempt from the tax under the unemployment compensation act. We think that the rule of that case should be applied in the case at bar. See also American Sumatra Tobacco Corp. vs. Tone, supra, and In Re Robey, 54 Wyo. 439, 93 Pac. 2d 940. Recent legislation of Congress and of most of the states gives even greater exemptions, so that we think that we should resolve whatever doubt exists in favor of exemption. The judgment of the trial court on this point should, accordingly, be affirmed.

III.   Processing for Customers.

Whether or not the plaintiffs were liable for a tax based on the services performed in processing potatoes for customers, that is to say, for other growers of potatoes, is another question and must be determined in the light of our own statute as amended in 1941. Counsel for the plaintiffs relies on the Utah case of Cache Val-

ley Turkey Growers Association vs. Industrial Commission cited supra, but that case is not in point. It was decided under a statute like the federal act of August 10, 1939, which enlarged the exemptions in connection with agricultural labor. Counsel for plaintiffs also relies on Batt vs. Unemployment Compensation Division, 63 Idaho 572, 123 Pac. 2d 1004, 139 A. L. R. 1157, but that case also is not in any way in point, for it is based on a statute broadly exempting agricultural labor without limiting that term as is done under our statute and under the federal regulation above mentioned. A striking illustration of the difference between the Idaho statute involved in the foregoing Idaho case and a statute or regulation limiting and defining as to what constitutes agricultural labor, as is done by the Wyoming amendment of 1941 and the federal regulation may be noted in the case of United States vs. Batt (1945), 59 Fed. Sup. 619, decided by the United States District Court of Idaho, affirmed by an opinion in 151 Fed. 2d 949. In that case, aside from the produce raised by defendant, the balance of such produce was that which the defendant purchased from the farmer-grower and found to be marketable after sorting and grading. The farmers delivered the produce at defendant's warehouse in half bags, as taken by them directly from the field, to enable the defendant and farmers to determine the part to be purchased. Defendant also handled potatoes on consignment, in which case the farmer delivered the potatoes from the field as harvested. After processing the consigned potatoes, defendant sold them, and from the sale price deducted the expense, including a charge for processing and brokerage, paying the balance to the farmer. In the case of all produce, the culls were owned by and were returned to the producer. The action in that case was brought by the United States to recover taxes for 1938 under the Federal Social Security Act, and was appar-

ently brought after the decision of the supreme court of Idaho above mentioned. Counsel for the defendant in these cases contended that the decision of the Idaho supreme court should be followed. The courts refused to do so, and the United States recovered the taxes for which it sued, the court of appeals stating, among other things:

"By Art. 206(1) of Treasury Regulations 90, the Department undertook to delimit specifically the scope of the statutory exemption. The article is copied on the margin. As will be observed from a reading of it, services of the kind performed here were not considered by the Treasury to be agricultural labor unless performed 'by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced,' and unless such processing is carried on as an incident to ordinary farming operations as distinguished from those of a manufacturing or commercial nature."

The same result was reached in Chester C. Fosgate Company vs. United States, 125 Fed. 2d 775, in Latimer vs. United States, 52 Fed. Sup. 228, and in North Whittier Heights Citrus Association vs. N. L. R. B., 109 Fed. 2d 76, certiorari denied, 310 U. S. 632, 60 S. Ct. 1075, 84 L. Ed. 1402. The last mentioned case did not refer to any federal regulation, and the court arrived at the result it reached without reference thereto. It cited an unreported case from Oregon, in which it was stated: "'The fruit growers who are engaged in the care, cultivation, picking, and delivery of the products of the orchard to be processed, graded, packed and marketed are engaged in agricultural labor and are exempt from the provisions of the statute. As soon as the fruit is delivered by the growers to the plaintiff for processing, grading, packing, and marketing, then the exempttion ceases. The plaintiffs engaged in processing, grading, and packing and marketing the fruits are engaged in industry and are, therefore, subject to the

provisions of the act and are not exempt as being engaged in agricultural labor.'" See also Idaho Potato Growers vs. N. L. R. B., 144 Fed. 2d 295.

H. Duys & Co. vs. Tone, 125 Conn. 300, 5 Atl. 2d 23, was an action brought by the administrator of the State Unemployment Compensation Act to recover certain taxes under the Act from the defendant. The facts are similar to the facts in the case at bar, except that that case involved processing of tobacco. The court stated the facts as follows:

"These operations were performed pursuant to separate contracts entered into by each of the growers and the corporation which constituted the latter the agent of the grower to process, pack and market the crop which the grower was to raise, it to receive a specified commission for selling the tobacco and guaranteeing the accounts and to buy, at an appraised price, whatever tobacco remained unsold at the end of two years. Upon the sale of the grower's tobacco the corporation was to deduct from the price received its commission and the cost of insuring, warehousing, processing, sampling, storing and shipping it, including taxes and brokers' commissions, if any, and to pay over the balance to the grower. No crops of tobacco other than those of the plaintiff growers were delivered to or handled at this warehouse. The sales of the tobacco were made in the name of the corporation but title to each grower's crop remained in him until sold."

The administrator had adopted a rule like the federal regulation above mentioned. The trial court held that rule to be invalid. The supreme Court stated the issue to be as follows:

"The controlling issue on this appeal relates to the conclusion above quoted—in effect that the provision in the regulations that in order to procure exemption from the tax, the employees doing the processing and packing must be employees of the owner or tenant of the farm on which the materials in their raw or natural state were produced, rendering exemption dependent

upon performance by employees of the grower himself, as distinguished from employees of those engaged distinctively in the processing and packing alone, is invalid because beyond the purview of the statute."

The supreme court reversed the trial court, holding the company liable for the tax.

The case of Employment Security Commission vs. Arizona Citrus Growers, Inc., 61 Ariz. 96, 144 Pac. 2d 682, involved the question as to whether or not a non-profit cooperative association was subject to the payment of a tax under the unemployment compensation law. The property rights and interests of each member of the association were equal. The members received all the proceeds from sales of products after administrative costs were deducted; the employees were engaged in the plant of the association in the manual work of grading, cleaning, raising and boxing fresh citrus fruits for the purpose of preparing the fruit for market. The statute exempted agricultural labor, but the Arizona Commission, by Rule I, had defined that term in the same way as the federal regulation above mentioned. Arizona changed its law in 1941 to conform to the federal act of August 10, 1939, above mentioned, and it was contended that the former legislative act of Arizona should be construed in the same way, although the labor in question had been performed before the Arizona legislative act of 1941 went into effect. The court refused to adopt that contention and held the association subject to the tax under the law as it stood prior to 1941. The court said, among other things:

"We conclude that the claimants who worked in the Association's packing house are not agricultural laborers, as that term is defined in Rule I, subdivision 2, which, as heretofore, pointed out, is the only yardstick to be applied in this case, and are therefore not exempt from the operation of the act. Their work was not carried on as an incident to ordinary farming operations, but was rather commercial in its nature.

"Rule I, subdivision 2, provides that labor such as that performed by the claimants herein 'does not constitute agricultural labor unless it is performed by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced'. Applying this standard to the facts as heretofore set forth, it is evident that the services in the present case were not performed by an employee of the 'owner or tenant' unless, as contended by the Appellee, that this phrase be so construed as to include employees of a cooperative marketing association as the alter ego of the owner or tenant.

\* \* \* \*

"We hold that during the period in controversy the services performed by the claimants in question were performed for a separate corporate entity and not for the owner or tenant of a farm on which the crops were grown."

The case of California Employment Commission vs. Butte County Rice Growers Association was before the California courts three times, reported in 138 Pac. 2d 347, in 146 Pac. 2d 908, in 25 Calif. 2d 624, 154 Pac. 2d 892, so that the supreme court must ultimately have given the case a most thorough consideration. The association constructed and maintained a warehouse where the rice of its members was stored, cleaned and prepared for market. The enterprise was operated without profit to the association. The latter, however, hired the employees, and the question was as to whether or not the association was subject to the tax under the unemployment insurance act of California. The statute exempted agricultural labor, but the California Commission, by Rule 7.1, defined that term in the same manner as under the federal regulation above mentioned. In the first case the district court of appeal held that the rule was invalid. In the second case the supreme court of the state upheld the validity of the rule, but also held that the association was exempt from tax under the law because it was a nonprofit cooperative

348

association: In the final case the court reviewed various cases, including North Whittier Heights Citrus Association vs. N. L. R. B., cited supra, and, holding the defendant liable for the tax, stated as follows:

"While the North Whittier case was decided in the light of the statutory language alone, the rationale of that decision becomes even more persuasive when correlated with the administrative definition of the term 'agricultural labor' embodied in rule 7.1, above quoted. Concededly, the services performed by the defendant's employees are not 'on a farm' and so do not meet the specification of subdivision (1) of said rule. Equally exclusive is the plain language of subdivision (2), for it requires that services rendered 'in connection with the drying, processing, packing, packaging, transportation, and marketing of materials which are produced on the farm' be 'incident to ordinary farming operations as distinguished from manufacturing or commercial operations' and be 'performed by an employee of the owner or tenant of the farm.' Thus, to come within the 'agricultural labor' exemption, off the farm services must be an integral part of farming operations performed for the farmer as such—not for a third person separate and apart from such fundamental concept. Regardless of any argument as to the commercial nature of the defendant association's enterprise, it admittedly is not the owner, tenant or operator of any farm land."

The court also considered the question as to whether or not the cooperative association might be considered as an employee of the owner or tenant of the farm, and on that point stated as follows:

"To overcome the barrier of the qualifying employment provision of said subdivision (2), the defendant argues that 'the corporation, the association, is nothing more than an instrumentality of the owners and tenants of the farms,' and 'defendant's employees were in effect the employees of the landowners or tenants.' Such observation is not only squarely at variance with the facts of this case—demonstrating that the defendant association in all its services functions as a unit wholly

independent of the farmers comprising its membership —but is likewise contrary to the elementary legal principle that a corporation is a complete legal entity separate and apart from the individuals who own it. The nature of the defendant's corporate structure is immaterial for 'cooperative corporations * * * are just as distinct an entity as are other private corporations.' Fletcher's Cyclopedia of Corporations (Perm. Ed.) vol. I, § 25, p. 90. The doctrine of separate entity will be disregarded only to prevent fraud or grave injustice. Hollywood Cleaning, etc., Co. v. Hollywood Laundry Service, 217 Cal. 124, 17 P. 2d 709. Obviously no such reason exists here for ignoring the plain language of the effective administrative definition—but, on the contrary, to treat the defendant corporation nevertheless as the alter ego of its individual farmer members would, in fact, promote injustice by unnecessarily restricting the operative scope of the unemployment insurance law of this state, a limitation wholly out of line with the beneficent purpose of such legislation that, consistent with its terms, the coverage provisions have a broad application. California Employment Comm. vs. Black-Foxe Military Inst., supra."

If that is the law in connection with a nonprofit cooperative association, so much more must that be true, of course, in the case of independent operators such as the plaintiffs in the case at bar.

In California Employment Commission vs. Rose, 67 Calif. App. 2d 864, 155 Pac. 2d 702, the court stated the facts in the case as follows:

"During the period of time which is involved in this suit, the respondent John Rose was engaged in the business of baling hay on contract for farmers who produced crops in Yolo County. He owned and operated his own hay baling equipment, and employed and paid eight men who performed the labor for him. He had the exclusive right to hire or fire these workmen. They were not necessarily farmers. The farmers who produced the hay paid to the contractor a stipulated amount per ton for the baling. The respondent's employees were paid by him an agreed sum per ton for

their services. Sometimes the hay was baled on the farms where it was produced, but to save cost and inconvenience of moving the hay-baling equipment, the hay was usually hauled to a location near the ranch, where it was baled."

The court held Rose liable for the tax under the unemployment insurance act and after quoting from the Arizona case above mentioned, concluded:

"It follows that the services performed, regardless of their nature, even though they consist of work on a hay baling press operated upon or off of the farm where the hay is produced, do not constitute 'agricultural labor' under the California Unemployment Insurance Act unless the workmen are employees of the owner or tenant of the farm upon which the materials are produced."

The hay baling in that case was not dissimilar from the processing involved in the case at bar, and the case disposes of the contention herein that the processing in the case at bar done on the farms should be treated differently from the processing done off the farms. In neither case were the employees the employees of the owner or tenant, and that is required in order to give exemption under the Wyoming amendment of 1941.

The court in the foregoing case also considered the question, similar to that raised in the Butte County Rice Growers Association case, supra, and in the Arizona case supra, as to whether or not the hay baler should be considered as the employee of the owner or tenant of the farm, and on that point stated as follows:

"The only remaining question to be determined on this appeal is whether the workmen engaged by John Rose on his hay baling equipment were 'employees of the owner or tenant of the farm on which the materials * * * were produced.' If they were not employees of the owners or tenants of the farms upon which the hay was produced, they may not be deemed to be exempt from payment of contributions to the unemployment fund. The undisputed facts of this case clearly show that the

workmen were not employed or under the direction or control of the owners or tenants of the farms. They are therefore not exempt." Etc.

So in the case at bar, it was stipulated that "all the work in connection with the handling of the potatoes after they have been harvested by the farmers is done by men employed by the plaintiffs, working under their direction and paid by them." The control or right of control of the physical conduct determines as to whether a person is an employee of another. Restatement of the Law of Agency, Sec. 2. See also Unemployment Compensation Commission vs. Mathews, 56 Wyo. 479, 111 Pac. 2d 111. So that, in the case at bar, the employees in question cannot be said to have been in the employ of the owners and tenants of the farms of the customers of the plaintiffs.

In the subsequent case of California Employment Commission vs. Kovacevich, (1946), 27 Calif. 2d 546, 165 Pac. 2d 917, the defendant Kovacevich bought fruit from various owners, and in some cases undertook to do the girdling, thinning and harvesting the crops. The court held such labor exempt from taxation, but as to other labor the court said:

"A different situation is presented with respect to that part of the services in question which was embraced within the classifications 'office help' and 'packing house labor,' as made by respondent. Those services were performed off the farm following the harvest, either in the packing house or in the office, and as an integral part of respondent's general business. Such services come within subdivision (2) of rule 7.1 and constitute 'agricultural labor' only if done 'by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced' and 'as an incident to ordinary farming operations as distinguished from manufacturing or commercial operations.'"

The court affirmed the decision by the district court of

appeals, appearing in 157 Pac. 2d 416. In this case it is true the defendant bought the fruit before processing it, but that would seem to make no difference since the decision is based, in part at least, on the fact that the packing house labor was not labor by an employee of the owner or tenant of the farm. When that is the controlling fact, or one of the controlling facts, under a valid rule or statute, it obviously makes no difference whether title passes before or after processing the crop. As stated in Latimer vs. United States, supra, the principal reason for exempting agricultural labor from social and industrial benefits resulting from remedial legislation has been administrative difficulties and accounting inconveniences in farm work, but with relation to employment in the operation and management of packing houses no such impediment exists. See also H. Duys & Co. vs. Tone, supra. The same result as above mentioned was reached in Florida Industrial Commission vs. Growers Equipment Co., 152 Fla. 595, 12 So. 2d 889, under a statute of the same import as the federal regulation above mentioned. The only difference in that case, if any, is the fact that the court laid stress on the fact that the processing in that case had reached the state of an industrial operation.

The case of Cowiche Growers, Inc. vs. Bates, 10 Wash. 2d 585, 117 Pac. 2d 624, was an action for a declaratory judgment to have the court hold that the labor involved in the action was agricultural labor, exempt from tax under the unemployment compensation act. Part of the plaintiffs were cooperative associations processing fruit in warehouses for the account of the farmer or grower of fruit on a cost per box basis, and which was charged directly to the grower. The statute of 1937 exempted agricultural labor in broad terms, without limiting it, but in an amendment of 1939 it was provided that the term employment should not include "agricultural labor; (services customarily

performed by a farm hand on a farm for the owner or tenant of a farm)"; It may be noted that this amendment was very similar to the Wyoming Amendment of 1941 above mentioned, although possibly somewhat more restrictive. In 1941 the State of Washington changed its law to conform to the federal amendment of August 10, 1939, above mentioned. But the court held that this change in the law did not affect the operations prior to that time. The court holding that all the plaintiffs were subject to the tax under the amendment of 1939, concluded as follows:

"We are further of the opinion that by Laws of 1939, chapter 214, the legislature, by stating 'Agricultural labor; (services customarily performed by a farm hand on a farm for the owner or tenant of a farm),' indicated in no uncertain terms that the term 'agricultural labor,' as used in the 1939 act, includes only labor performed on a farm, by a farm hand, for the owner or tenant of the farm, and that this was an interpretation of the meaning of the term 'agricultural labor,' as used in the 1937 act."

The identical question came before the Washington court in the later case of In Re Yakima Fruit Growers Association, 20 Wash. 2d 202, 146 Pac. 2d 800, and the court upheld its former decision in an elaborate opinion.

It is, of course, quite clear that if we are to follow the numerous cases above mentioned involving a regulation or statute of similar import as our 1941 amendment, we shall be constrained to reverse the judgment of the trial court on the point now under discussion. We should not omit, however, to mention that there is one discordant note. The statute of Idaho originally exempted agricultural labor without defining or limiting that term. In 1941 the Idaho legislature adopted an amendment identical with the Wyoming amendment of 1941, adding thereto merely a proviso which need

not be mentioned here. In 1943, however, the legislature changed the law to conform with the federal amendment of August 10, 1939, above mentioned, so that the 1941 amendment in Idaho was in effect only for the period of two years. But operations under that amendment came before the Idaho supreme court in 1945 in the case of P. G. Batt, 66 Idaho 188, 157 Pac. 2d 547. P. G. Batt owned some two thousand acres of land on which he raised potatoes and other vegetables, and which he processed. He incidentally, also processed the produce of his neighbors whose farming operations were not large enough to justify the expense of buying equipment and assembling a crew of laborers. The board which administered the unemployment compensation law seemingly made an assessment against Batt for all his processing operations. The court, however, held that Batt would not be liable "for contributions upon wages paid for services rendered by his employees in processing, packing and marketing farm products raised on his own farm or produce purchased or received on consignment for processing", and to hold him liable for a tax in connection with processing for others would create a discrimination against the small farmer, and that it was convinced that the legislature did not intend to make such discrimination possible. The court did not refer to any of the cases heretofore cited holding the contrary on the latter point, although its attention was called to some of them by counsel. In the Idaho case the processing for customers was incidental, whereas in the case at bar that was the main portion of the plaintiff's operations, but we are not certain of the significance of that distinction. However, the Idaho court had one circumstance upon which it could seize, and doubtless did seize, to show the intention of the legislature, namely the fact that before 1941 all agricultural labor was exempt from tax; the 1941 amendment was in force but two years and was promptly

repealed in 1943. We have seen that the supreme court of Washington, under a similar legislative situation, twice came to the opposite conclusion. In the case at bar we are not cognizant of a single circumstance to indicate that the legislative intent was different from that plainly expressed in the Wyoming amendment of 1941. That amendment, as heretofore shown, gives rise to an exemption from tax in a case like. that at bar only in case of "services performed in the employ of an owner or tenant operating a farm or ranch". That is clear enough and not easily misunderstood. The services in this case for customers were not performed by such employees, but by employees of the processors who were not the "owner or tenant" as stated in the statute. There is nothing anomalous in giving effect to the plain reading of the statute. The discrimination mentioned by the Idaho court existed under the Federal law for five years; it existed in the laws of a number of states for several years; it still exists, as far as we know, in California and probably in other states. That fact, if a circumstance of any value, shows that we should not attempt to give any interpretation to our statute other than according to its natural reading. The argument that the cost of the processing is shifted in the first instance onto the customers of the processors if of no significance. The cost of processing is the same in the case of processors who raise their own potatoes. Both, in determining the sale price, will take into consideration (a) the cost of raising the potatoes, (b) the cost of processing, (c) profits to be made, and they will shift these items to the ultimate consumer. If no profits can be made, the farmer will, in the long run at least, cease to raise potatoes. The only difference exists in the payment of the tax which the processor will not pay on potatoes raised by himself. The tax to be paid will, in the first instance, be shifted, of course, to the customer for whom processing is done. If that was not done in

the past it is by reason of the misinterpretation of our statute. We do not know why the Wyoming legislature 'refused or neglected to adopt the more recent legislation of Congress and of most of the states which eliminates all possible discrimination above mentioned under facts like those in the case at bar. It may be that the legislature thought that the burden of the tax in the case of processing for customers as opposed to the exemption in the case of processors who raise their own potatoes would be offset by the burden of purchasing and owning equipment for processing, on which, of course, there is a constant depreciation. But whether or not such burden would be so offset, the question is one of economics which is for the legislature to solve and not for those with the humbler duty of interpreting acts of the legislature, assuming that the acts are valid. In this case as already stated, the validity of the legislative act in question is not attacked.

One purpose of setting out the course of the more recent legislation on the subject before us, both on the part of the federal government as well as on the part of most of the states, has been to call our legislature's attention thereto so that if any changes are desired to be made in the law it may be done intelligently. But we have not felt that we ourselves should make such change by an interpretation which the statute does not bear.

The judgment of the trial court is, accordingly, reversed in so far as it is held that taxes based upon wages paid for processing potatoes for customers may be recovered; in other respects it is affirmed.

RINER, C. J., and KIMBALL, J., concur.