PIONEER POTATO CO., INC., RESPONDENT, v. DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR AND INDUSTRY, STATE OF NEW JERSEY, APPELLANT.

Argued January 31, 1955—Decided February 28, 1955.

544

*Mr. Herman D. Ringle* argued the cause for appellant.

*Mr. George Warren* argued the cause for respondent (*Mr. Barclay Malsbury*, attorney; *Messrs. Warren & Stein*, of counsel; *Mr. Lewis C. Stanley* on the brief).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.   The question is whether Pioneer Potato Co., Inc., is liable to pay contributions under *R. S.* 43:21-7 of the Unemployment Compensation Law as to wages paid migrant workers employed in 1949 to clean, grade and pack potatoes after the potato harvest of that year. The Appellate Division determined that the services of the migrant workers constituted "agricultural labor" expressly excluded by *R. S.* 43:21-19(*i*)(*7*)(*A*) of the act, 31 *N. J. Super.* 553 (1954). We granted certification on the petition of the Division of Employment Security, 16 *N. J.* 414 (1954).

Pioneer's stockholders are potato farmers. The post-harvesting services of washing, grading and packing are essential to the preparation of the potatoes for market. The farmer-

stockholders have these services performed at Pioneer's plant and thus avoid the higher cost of equipping their own farms and employing their own workers to do the work on the farms. Each farmer-stockholder brings his crop in 100-pound field bags from the fields to the plant where Pioneer's migrant workers wash, dry, pick, grade and finally pack them in wired or sewn 5, 10 and 15-pound bags for shipment to buyers.

Pioneer secured the migrant workers through one Barney Boston, who, for $550, supervised their performance of the work according to Pioneer's instructions. At the end of each week Boston paid the wages of the workers with funds supplied to him by Pioneer. The operation entailed the dumping of the potatoes from the field sacks into a grading machine hopper from which the potatoes proceeded by conveyor belt through a washing unit and a drying unit, over a picking table where defective potatoes were picked out, thence over grading tables, and finally to a packing platform for packaging. Some of the migrant laborers also loaded the bags on trucks or freight cars for shipment.

Pioneer arranged for the sale of the packaged potatoes at prices and on terms suitable to it. Whether or not Pioneer received immediate payment of the sales price, each farmer-stockholder was paid for his potatoes at the end of each week at a rate representing the average of the unit prices at which Pioneer sold potatoes during that week. Any excess of actual sales prices over such average unit prices, after expenses, represented Pioneer's profit. The company also sold seeds and fertilizers.

■ The Federal Government's national plan for social security originated with the Social Security Act of 1935, 49 *Stat.* 620, *ch.* 531, *Public No.* 271, *74th Cong.*, approved August 14, 1935. The plan makes provision for old age and survivors insurance and for unemployment insurance. Both are financed by taxes, imposed, in the case of old age and survivors insurance, by the Federal Insurance Contribution Act, 26 *U. S. C. A.*, *sec.* 1400 *et seq.*, *Internal Revenue Code of 1939*, now *sec.* 3101 *et seq.* of the *Internal Revenue Code*

*of* 1954, and, in the case of unemployment insurance, by the Federal Unemployment Tax Act, 26 *U. S. C. A., sec.* 1600 *et seq., Internal Revenue Code of* 1939, now *sec.* 3301 *et seq.* of the 1954 Code. Each state establishes its own unemployment insurance fund and contributions thereto are allowed as credits against the taxes payable under the Federal Unemployment Tax Act to the extent provided by the latter law, *Internal Revenue Code of* 1954, *sec.* 3302. The state statutes form an integral part of the national plan and are designed to work closely with the federal legislation.

Agricultural workers are excluded from unemployment insurance coverage and, after 1950 amendments to the Federal Insurance Contribution Act, in less numbers, from old age and survivors insurance. It is not that such workers are in less need of the coverage than industrial workers; objection to their inclusion stemmed chiefly from apprehended difficulties in administering a farm program and from fears of excessively high costs. "Determination of employment relationship, record keeping, and wage reporting, and collection of taxes are stressed as major obstacles to covering farm workers." *Greenfield, Unemployment Insurance for Farm Workers, p. i (Bureau of Public Administration, University of California,* 1953).

The federal unemployment insurance statutes and the original state statutes patterned upon them accomplished the exclusion under the term "agricultural labor" without definition or limitation. Wide variation in interpretation was inevitable. For tax collection purposes the Bureau of Internal Revenue developed Treasury Regulations (Regulation 90 for unemployment insurance taxes), which confined the excluded services to those performed for a farm operator, on his farm, and to processes which were incidental to ordinary farm operations. Many states, like California, adopted a substantially identical regulation, *California Employment Commission v. Kovacevich,* 27 *Cal.* 2d 546, 165 *P.* 2d 917 (*Sup. Ct.* 1946), rehearing denied, or, like New York, incorporated the definition in an amendment to the state law, *In re Lazarus,*

294 *N. Y.* 613, 64 *N. E. 2d* 169 (*Ct. App.* 1945). Regulation 90 operated to restrict the exclusion as to services of the kind involved in the instant case and the Congress superseded it in 1939 with a statutory definition effective after January 1, 1940, *Act of August* 10, 1939, 53 *Stat.* 1392; 26 *U. S. C. A., sec.* 1607(*l*). The statutory definition was taken from the Agricultural Marketing Act, 46 *Stat.* 11, as amended in 1931. *United States v. Turner Turpentine Co.*, 111 *F. 2d* 400, 403 (*5th Cir.* 1940). The definition has been continued in subsequent revisions and now appears as *section* 3306 (*c*) (*l*) and (*k*) of the *Internal Revenue Code of* 1954. In 35 of the state laws the exclusion provisions for "agricultural labor" now define the term substantially the same way as the Federal Unemployment Tax Act.  *Greenfield, supra.*

It should be noted that the exclusion of agricultural workers under the Federal Insurance Contribution Law, for purposes of old age and survivors insurance taxes, followed the pattern of the Federal Unemployment Tax Act until 1950 when a new definition, enacted by *Act of August 28,* 1950, 64 *Stat.* 492, 26 *U. S. C. A., sec.* 1426(*h*), *Internal Revenue Code of* 1954, *sec.* 3121(*g*), and see 42 *U. S. C. A., sec.* 410(*f*), contracted the breadth of the exclusion and extended coverage of old age and survivors insurance to classes of agricultural workers who are nevertheless still denied coverage under the unemployment insurance laws.  For example, post-harvesting services, formerly excluded from old age and survivors insurance coverage, are brought in by the provision of the 1950 amendment, *Internal Revenue Code of* 1954, *sec.* 3121(*g*) (4)(*B*), denying the exclusion for services of employees in the employ of a group of farmers unless the group comprises less than 20 operators and is unincorporated and unless such operators produced all of the commodity with respect to which such service is performed.  Pioneer apparently has less than 20 farmer-stockholders and can meet the test in other respects, but, as a corporation, the post-harvesting services of its employees would be denied the exclusion.  2 *U. S. Cong. Serv.* 81*st Cong., 2d Sess.* 1950, *pp.* 3384–3385.

■ Our Legislature did not follow the lead of the 35 other states and amend our unemployment compensation statute to incorporate the 1939 statutory definition added to the federal law. Nor, so far as appears, has the state agency adopted a regulation defining the term. This need not, however, deter us from consulting the federal definition and the decisions dealing with it and the parallel provisions of the laws of our sister states, to aid us in deciding whether or not the services in the instant case constituted "agricultural labor." We are justified in doing so, not alone because of the obvious necessity of harmonizing where possible our state law with the federal acts but also because, we think, the federal definition and those decisions point to the circumstances under which the services which concern us here are deemed in common experience and acceptance to be agricultural rather than mercantile or industrial in character.

All authorities agree that the initial intent was to effect a broad exclusion "wide enough and broad enough to cover and embrace agricultural labor of any and every kind" as commonly understood where the particular statute operates. *United States v. Turner Turpentine Co., supra.* The supporters of the original plan feared that if a broad exclusion was not provided, the Congress might not pass the legislation because the tax, for farmers, would be "such a nuisance and cause such a clamor that the very ideal of the structure * * * would be endangered." 79 *Cong. Rec.* 5902–03, April 17, 1935. "I do not want to see the country saddled with an administrative problem which will become a fizzle and therefore react ultimately against the whole plan." Testimony of Dr. Abraham Epstein, *U. S. Senate, 74th Congress, 1st Session, Committee on Finance, Hearings on S.* 1130, *Economic Security Act, p.* 514 (1935). This accounts for comments in decisions that, while an unemployment compensation law is liberally construed to further its remedial and beneficient purposes, *Ludwigsen v. N. J. Dept. of Labor & Industry,* 12 *N. J.* 64 (1953), the interpretation should not exceed the limits of the statutory intent. The term "agri-

cultural labor" was designedly "broad and sweeping, and should not be whittled down by narrowness of construction," *Henry A. Dreer, Inc., v. Unemployment Compensation Commission*, 127 *N. J. L.* 149, 152 (*Sup. Ct.* 1941).

Both Treasury Regulation 90 and the 1939 statutory definition confirmed the breadth of the exclusion as to pre-harvest services in connection with the cultivation of the soil, and the raising and harvesting of crops. Those services are not covered employment even though the employer is not a farm operator. *California Employment Commission v. Kovacevich, supra; United States v. Turner Turpentine Co., supra*, and see *Henry A. Dreer, Inc., v. Unemployment Compensation Commission, supra*. The difficulty under the Regulation arose as to post-harvest activities in connection with the drying, processing, packaging, transportation and marketing of the harvested crop. Under the Regulation, even when carried on as an incident to ordinary farming operations as distinguished from manufacturing or commercial operations, such services were not within the exclusion unless "performed by *an employee of the owner or tenant of the farm* on which the materials in their raw or natural state were produced." The services of Pioneer's migrant workers would not be excluded under that test.

But when the services are performed for the farmer to enable him to market his crop they are not the less agricultural activities as commonly understood, and a distinction based upon whether his own employees perform them or they are performed for him by the employees of another was deemed to be unrealistic in the light of accepted farming practice and the actualities of farm economics. The situation is not, then, like that in which the farmer sells his crop directly from the field to a commercial canner or commercial freezer, or to a retail store or distributor of foodstuffs. Such buyers are obviously engaged in industrial or mercantile pursuits and the workers employed by them to prepare the produce as an incident to such a business are not performing services in an agricultural activity although the operations

performed may be the same. However, the courts considered that the regulation and its state counterparts required them to find in favor of unemployment insurance coverage when the services were not rendered by the farmer's own employees even though performed for the farmer to ready his crop for market as an ordinary and usual incident of his farming business. *Chester C. Fosgate Co. v. United States*, 125 *F. 2d* 775 (*5th Cir.* 1942); *Jones v. Gaylord Guernsey Farms*, 128 *F. 2d* 1008 (*10th Cir.* 1942); *Latimer v. United States*, 52 *F. Supp.* 228 (*D. C. S. D. Cent. Div. Cal.* 1943); *California Employment Commission v. Kovacevich, supra.*

The criticism most often leveled at the regulation was that it ignored a hard fact of farm economics, namely, that small farmers are often forced to band together to have these services performed for them if they are successfully to compete with large producers financially able to mechanize the operations on their own farms. And the regulation produced the anomalous result of taxing the small farmer on whose account the exclusion was originally enacted while the larger producer who installed the necessary machinery on his farm escaped the tax entirely. As noted by Judge Conway in his dissenting opinion in *In re Lazarus, supra,* 64 *N. E. 2d*, at *page* 173,

"* * * discrimination had resulted as against small producers of fruits and vegetables who did not have sufficient capital to install upon their farms the machinery necessary for cleaning, grading, processing and packaging their fruits and vegetables and in favor of the large producers who were financially able to install on their farms the necessary machinery and to have the appropriate services performed on their farms by their own employees. The latter paid no tax with reference to such services. The small producers sent their fruits and vegetables to local co-operatives for the rendition of similar services and since those employer co-operatives were required to pay taxes for the benefit of their employees, the net price received by the small producers was decreased by the amount of the taxes paid. The small farmer thus received less for his farm products than the large producer."

When the Congress superseded the regulation with the 1939 statutory definition, both Senate and House Reports noted

the necessity for doing so because the "incidence of the taxes falls exclusively upon the farmer, a factor which, in numerous instances, has resulted in the establishment of competitive advantages on the part of the large farm operators to the detriment of the smaller ones." *Sen. Rep.* 734, *76th Cong. 1st Sess., p.* 61; *House Rep.* 728, *76th Cong. 1st Sess., p.* 51.

█ Under the statutory definition, consistent with the common understanding of what is not agricultural labor, the exclusion does not extend to services of the instant nature performed in connection with commercial canning or commercial freezing, nor to services performed in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption. The exclusion does extend, however, in the case of any horticultural or agricultural commodity, to such services, though not performed by employees in the employ of the owner or tenant of a farm, if performed as "an incident to ordinary farming operations," and in the case of fruits and vegetables, such services constitute "agricultural labor" even though not performed as an incident to ordinary farming operations, provided they are rendered as "an incident to the preparation of such fruits or vegetables for market." So, as to fruits and vegetables, such services performed as an incident to the preparation of the fruits or vegetables for market "will be excepted irrespective of whether performed in the employ of a farmer, a farmers' cooperative, or a commercial handler of such commodities." *Sen. Rep., supra, p.* 64; *House Rep., supra, p.* 53.

Two Michigan Supreme Court decisions illustrate the opposite results reached under that state's counterparts of Regulation 90 and the 1939 statutory definition as to the services of workers engaged by a bean elevator to pick and salt beans preparatory to marketing them. In *Minor Walton Bean Co. v. Michigan Unemployment Compensation Commission,* 308 *Mich.* 636, 14 *N. W. 2d* 524 (1944), decided under a counterpart of the regulation, the services were held to be covered employment. In *Michigan Unemployment*

*Compensation Commission v. Unionville Milling Co.*, 313
*Mich.* 292, 21 *N. W.* 2*d* 135 (1946), decided after Michigan's
statute was amended to incorporate the 1939 statutory defini-
tion, the services were held to constitute agricultural labor.

■ It is plain to us that the 1939 statutory definition was
developed in the light of the realities of farm economics
and the common understanding of the services embodied in
agricultural labor. The amendment is therefore of persuasive
significance in determining the scope of that term under our
own statute. Particularly is that the case here when Pioneer's
services were in fact rendered as an incident to the ordinary
farming operations of its farmer-stockholders, although the
amendment extends the exclusion to post-harvest services
incident to the preparation of fruits or vegetables for market
without regard to whether they are also incident to ordinary
farming operations. Pioneer is not the purchaser of their
potatoes, except in form; the real buyers from the farmer-
stockholders are those who purchase the packaged potatoes.
It is the price they pay that determines the farmer-stock-
holder's return, initially at a rate which is the average of the
unit prices received from such purchasers, and ultimately
that sum plus any dividends or other share in profits which
the farmer-stockholder may receive. The service Pioneer
renders for its farmer-stockholders falls squarely within that
which the 1939 amendment was enacted to exclude from
coverage, that is, such service "whether the service is per-
formed directly by the farmer who has machinery adapted to
that operation, or by a third party in behalf of the farmer
who lacks machinery essential to prepare the product for
market." *In re Lazarus*, 64 *N. E.* 2*d*, at *page* 171. Clearly
it is not a case, as the Division insists, in which each farmer-
stockholder "parted with all of his economic interest in the
[potatoes, their] future form or destiny," language which
appears in *Miller v. Burger*, 161 *F.* 2*d* 992, 994 (*9th Cir.*
1947), and was relied on in *Ewing v. McLean*, 189 *F.* 2*d* 887
(*9th Cir.* 1951). Pioneer was not its farmer-stockholders'
"terminal market" in the sense of the provision of the 1939

amendment denying the exclusion for services performed after delivery for distribution for consumption. Indeed, the service here is more clearly incidental to the farming business of Pioneer's farmer-stockholders than was that in the *Lazarus* case where the New York Court of Appeals held that the services of employees engaged by the owner of bean elevators to prepare for market beans purchased outright from farmer-growers were services "incident to the preparation of the beans for 'market' " and not a delivery at a terminal market since it appeared that the cost of cleaning the beans was deducted by the employer from the price paid to the farmers.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.