60 N.J. Super. 380 (1960)
159 A.2d 131
RALPH SPACE, PETITIONER-APPELLANT,
v.
DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR AND INDUSTRY, AND CARL HOLDERMAN, COMMISSIONER OF LABOR AND INDUSTRY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 1959.
Decided March 22, 1960.
*382 Before Judges PRICE, GAULKIN and SULLIVAN.
Mr. Francis E. Bright argued the cause for petitioner-appellant (Messrs. Dolan and Dolan, attorneys).
Mr. Herman D. Ringle argued the cause for defendants-respondents.
The opinion of the court was delivered by PRICE, S.J.A.D.
Appellant challenges the legal propriety of the determination of the Commissioner of Labor and Industry, affirming the decision of the Director of the Division of Employment Security, that appellant is subject to the provisions of the Unemployment Compensation Law (N.J.S.A. 43:21-19(h)(1)). The specific issue is the correctness of the Commissioner's determination that services performed by appellant's employees on his farm "in the raising and breeding of mink constitute employment as defined by the Unemployment Compensation Law and do not fall within the exception of `agricultural labor,'" (N.J.S.A. 43:21-19(i)(7)(A)). The result of such determination is to impose on petitioner the obligation of contributing to the State Unemployment Compensation Fund and the Disability Benefits Fund (hereinafter designated Funds).
The record before us reveals that initially, by letter dated December 17, 1956, the Chief of Contributors' Service of the State Department of Labor and Industry, Division of Employment Security, advised petitioner that he was obliged to make such contributions. The letter stated that petitioner "attained subject status on May 11, 1952, and would be liable for reports and employer contributions for all periods *383 beginning with January 1, 1952." Petitioner, requesting a hearing before the Director of the Division, contended that all of his employees were engaged in "agricultural labor" and that by virtue of N.J.S.A. 43:21-19(i)(7)(A) he was exempt from any obligation to contribute to the Funds. Following a hearing on March 29, 1957 the Director made "Findings of Fact," and on June 23, 1958 issued an "Opinion and Decision" upholding the earlier determination. Petitioner appealed to the Commissioner of Labor and Industry who, as above noted, ruled that petitioner was a "subject employer."
There is no factual dispute. Petitioner owns approximately 450 acres of farm land in Sussex County, of which 175 to 200 acres are tillable. He there conducts general farming, including the raising of corn, alfalfa, hay and fruit; has horses which he uses in farm work; has a dairy operation with approximately 60 milk cows producing approximately 216,000 quarts of milk annually. The milk is taken daily in cans to a creamery. On a three-acre section of his farm are located pens in which mink are housed. He conducts an operation involving the breeding, raising and slaughtering of approximately 8,000 mink annually and the removing, drying and grading of their pelts. The pelts are then sent to a New York auction market conducted by a corporation which grades the pelts as to quality, catalogues them and sells them on a commission basis. The mink raised by appellant are mutations or hybrids. They are bred in March, have their young in May, are weaned in July and killed by humane methods and pelted in December. Appellant testified that the breeding stock is carried from year to year.
Appellant has the usual farm equipment consisting of a four-wheel tractor, a caterpillar tractor, planters and plows. The farm buildings include the necessary and usual barns, silo and outbuildings. Between six and eight full-time farm hands are engaged throughout each year. There are seasonal additions to that number. All of the employees are engaged *384 indiscriminately in all of the activities: general farming, planting, raising and harvesting of crops; in the dairy operation and in the work incident to the breeding, raising and slaughtering of the mink. The length of time in each activity varies with the seasons. No employee devotes his time exclusively to any one endeavor. They work seven days a week, with every third Sunday off on a rotating basis. They have no fixed hours of daily employment. Their wages range from $165 to $250 per month. As part of the compensation for their employment appellant's employees receive rent-free housing in tenant houses on the farm; they are supplied with oil or wood for fuel and some of them receive milk.
The proofs show that products of the farm are used for the feeding and bedding of the cows and the mink. Certain meats, fish, grain and cereals for the feeding of the mink and similar grain for the cattle are procured from outside suppliers. A large amount of the alfalfa raised on the farm is mixed with vegetable matter and fed to the mink, and apples raised on the farm are also fed to them. Many tons of hay are annually used for the "bedding" and "nesting" of the mink. The remainder of the hay is stored and "used for the feeding of the cattle in the winter months." The corn is "put into silage" and likewise fed to the cattle. Both mink and cow manure are spread on the fields "as fertilizer for the crops."
It is recognized that the New Jersey Unemployment Compensation Law from its inception excepted "agricultural labor" from its coverage. However, no definition of the term has ever been incorporated in the statute.
Appellant relies on the decision of the court in Pioneer Potato Co. v. Div. of Employment Security, 17 N.J. 543 (1955), in which the significance to be accorded by our courts to comparable federal legislation in this field was determined. He contends that the Pioneer decision "when applied to the instant case compels the conclusion that mink farming is an agricultural pursuit." He takes the position that (a) "fur *385 farming is per se an agricultural pursuit falling within the general class of animal husbandry," and (b) that during the years under scrutiny the uncontradicted evidence conclusively shows that the "operation of the Space farm involves `agricultural labor' whether fur farming normally does or not." He stresses the fact that "in 1939 Congress amended both the Federal Insurance Contributions Act (now 26 U.S.C.A. 3121(g)) and the Federal Unemployment Tax Act (now 26 U.S.C.A. 3306(k)) in identical fashion * * *," in the following pertinent particulars:
"For purposes of this chapter, the term `agricultural labor' includes all service performed 
(1) on a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wildlife;
(2) in the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment, or in salvaging timber or clearing land of brush and other debris left by a hurricane, if the major part of such service is performed on a farm;

* * * * * * * *
(4) in handling, planting, drying, packing, packaging, processing, freezing, grading, storing or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; but only if such service is performed as an incident to ordinary farming operations or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption.
As used in this subsection, the term `farm' includes stock, dairy, poultry, fruit, fur-bearing animal, and truck farms, plantations, ranches, nurseries, ranges, greenhouses or other similar structures used primarily for the raising of agricultural or horticultural commodities, and orchards." (Emphasis supplied.)
Appellant further emphasizes that his farm operation is a unit operation involving the breeding, raising and slaughtering *386 of mink and the maintenance of a dairy, and not two separate and distinct operations as claimed by respondent; that although the proofs show that he makes more money from the sale of mink pelts than he derives from the sale of milk, attention should be focused on the fact that the evidence definitely established that by a wide margin the greater number of hours of labor by his employees was devoted to work which beyond controversy was agricultural; that in the tilling of the fields and the harvesting of the farm crops the services of the laborers are directly and inseparably related to the care of both the dairy cows and the mink.
Respondent, stressing the absence in the New Jersey act of any statutory definition of "agricultural labor," comparable with that contained in the federal legislation, contends that the "traditional" meaning of those words should control and that such meaning would not encompass the raising and pelting of mink on a commercial scale. It contends that the decision of the Supreme Court in Pioneer, supra, affords no justification for holding that under the New Jersey Unemployment Compensation Law the term "agricultural labor" should be deemed to encompass labor employed in raising mink; that appellant is engaged in two pursuits, one "agricultural" and the other "industrial or commercial"; that Space should be required to segregate "his employees' services, covered and exempt, on a time or percentage basis and report their earnings in the industrial or commercial pursuit under the provisions of the Unemployment Compensation Law * * *."
The elements to be considered in determining the meaning to be ascribed to the words "agricultural labor," as they appear in N.J.S.A. 43:21-19(i)(7)(A), were outlined and the "persuasive significance" of federal legislation in the same field as bearing on that determination, was emphasized in Pioneer, supra. The factual situation in that case, however, was unrelated to that presented in the case at bar. In the cited case, on which appellant relies so heavily, *387 the Supreme Court, on application of the Division of Employment Security, had certified for review (16 N.J. 414 (1954)) the decision of this court (31 N.J. Super. 553 (App. Div. 1954)) which had determined that the services of migrant workers employed by Pioneer Potato Co., Inc., which encompassed "post-harvesting services of washing, grading and packing" of potatoes for market, constituted "agricultural labor" expressly excluded by the aforesaid act. The issue to be resolved was whether the aforesaid post-harvesting activities, "even when carried on as an incident to ordinary farming operations," were within the exclusory term of "agricultural labor" in view of the fact that the services there under consideration were not performed by employees of the owners of the farms on which the potatoes were produced, but by a separate corporate entity whose stockholders were the farmer-owners.
The court in Pioneer, reviewing the Federal Government's national plan for social security, noted that each state "establishes its own unemployment insurance fund" and that "contributions thereto are allowed as credits against the taxes payable under the Federal Unemployment Tax Act to the extent provided by the latter law * * *." The court specifically noted (17 N.J., at page 547) that the "state statutes form an integral part of the national plan and are designed to work closely with the federal legislation"; and that both the "federal unemployment insurance statutes and the original state statutes patterned upon them accomplished the exclusion under the term `agricultural labor' without definition or limitation." As a result of the absence of such definition the court noted that "[w]ide variation in interpretation was inevitable" and that for tax collection purposes the Bureau of Internal Revenue developed and promulgated Regulation 90 for unemployment insurance taxes which "confined the excluded services to those performed for a farm operator, on his farm, and to processes which were incidental to ordinary farm operations." The court pointed out (17 N.J., at page 548) that the aforesaid regulation *388 "operated to restrict the exclusion" as to services of the kind involved in Pioneer and that "Congress superseded it in 1939" with the aforesaid statutory definition of agricultural labor, "effective after January 1, 1940, Act of August 10, 1939, 53 Stat. 1392; 26 U.S.C.A., sec. 1607(l)." The court observed that "[t]he statutory definition was taken from the Agricultural Marketing Act, 46 Stat. 11, as amended in 1931 [12 U.S.C.A. § 1141 et seq.]. United States v. Turner Turpentine Co., 111 F.2d 400, 403 (5 Cir. 1940)," and stated that the definition has been continued in subsequent revisions and now appears as section 3306 (c) (l) and (k) of the Internal Revenue Code of 1954. The court noted that "[i]n 35 of the state laws the exclusion provisions for `agricultural labor' now define the term substantially the same way as the Federal Unemployment Tax Act."
Mr. Justice Brennan, in the opinion for the court, stated (17 N.J., at page 549):
"Our Legislature did not follow the lead of the 35 other states and amend our unemployment compensation statute to incorporate the 1939 statutory definition added to the federal law. Nor, so far as appears, has the state agency adopted a regulation defining the term. This need not, however, deter us from consulting the federal definition and the decisions dealing with it and the parallel provisions of the laws of our sister states, to aid us in deciding whether or not the services in the instant case constituted `agricultural labor.' We are justified in doing so, not alone because of the obvious necessity of harmonizing where possible our state law with the federal acts but also bcause, we think, the federal definition and those decisions point to the circumstances under which the services which concern us here are deemed in common experience and acceptance to be agricultural rather than mercantile or industrial in character.
All authorities agree that the initial intent was to effect a broad exclusion `wide enough and broad enough to cover and embrace agricultural labor of any and every kind' as commonly understood where the particular statute operates. * * *" Citing United States v. Turner Turpentine Co., 111 F.2d 400 (5 Cir. 1940).
He then noted (17 N.J., at page 549) that while it was recognized that "an unemployment compensation law is liberally construed to further its remedial and beneficent purposes, Ludwigsen v. N.J. Dept. of Labor & Industry, *389 12 N.J. 64 (1953), the interpretation should not exceed the limits of the statutory intent." He added: "The term `agricultural labor' was designedly `broad and sweeping, and should not be whittled down by narrowness of construction,' Henry A. Dreer, Inc. v. Unemployment Compensation Commission, 127 N.J.L. 149, 152 (Sup. Ct. 1941)." The court then stated (17 N.J., at page 553):
"It is plain to us that the 1939 statutory definition was developed in the light of the realities of farm economics and the common understanding of the services embodied in agricultural labor. The amendment is therefore of persuasive significance in determining the scope of that term under our own statute."
The court held (17 N.J., at page 553) that the "service Pioneer renders for its farmer-stockholders falls squarely within that which the 1939 amendment was enacted to exclude from coverage, that is, such service `whether the service is performed directly by the farmer who has machinery adapted to that operation, or by a third party in behalf of the farmer who lacks machinery essential to prepare the product for market. In re Lazarus [294 N.Y. 613], 64 N.E.2d [169], at page 171."
It is clear that the decision in Pioneer is not dispositive of the issue presented in the instant case. The enactment of the aforesaid 1939 federal amendment to include "fur-bearing" animals does not mean that by virtue thereof the work of breeding, raising and slaughtering mink on the Space farm is automatically to be considered as included within the term "agricultural labor" as it appears in the New Jersey act. So to consider it would be to ignore the fact that New Jersey has refrained from following the pattern of the federal and state legislation in this regard and would, as stated by our Supreme Court, in considering the effect of another section of the federal act, "write into our statute the very language contained in the federal exclusion." William H. Goldberg & Co. v. Div. of Employment Sec., 21 N.J. 107, 112 (1956). This we may *390 not do. To the same effect see Shore Fishery, Inc., v. Board of Review, &c., 127 N.J.L. 87, at page 93 (Sup. Ct. 1941), where the court said:
"* * * Nor are we in anywise bound by the amendment to the federal act; for, as stated by Mr. Justice Cardozo in Chas. C. Steward Mach. Co. v. Davis, 301 U.S. 548 [57 S.Ct. 883, 893], 81 L.Ed. 1279, 1294, the federal `statute does not call for a surrender by the states of powers essential to their quasi-sovereign existence.' Nor does the desire for a national co-operative scheme in anyway demand a uniform interpretation of the words here in question. * * *"
However, in resolving the issue in the case at bar, we, as was done in Pioneer, consult the "federal definition and the decisions dealing with it and the parallel provisions of the laws of our sister states" for the single purpose stated therein (17 N.J., at page 549) i.e., "to aid us in deciding whether or not the services in the instant case constituted `agricultural labor.'" The basic justification for so doing, as above noted in Pioneer (17 N.J., at page 549), was "because of the obvious necessity of harmonizing where possible our state law with the federal acts." The court in that case was also of the opinion that "the federal definition and those decisions point to the circumstances under which the services," with which the court was there concerned, "are deemed in common experience and acceptance to be agricultural rather than mercantile or industrial in character." In examining those circumstances the court stated (17 N.J., at page 550), "when the services are performed for the farmer to enable him to market his crop they are not the less agricultural activities as commonly understood, and a distinction based upon whether his own employees perform them or they are performed for him by the employees of another was deemed to be unrealistic in the light of accepted farming practice and the actualities of farm economics." Emphasis was placed by the court (17 N.J., at page 552) on the fact that under "the statutory definition, consistent with the common understanding *391 of what is not agricultural labor, the exclusion does not extend to services of the instant nature performed in connection with commercial canning or commercial freezing, nor to services performed in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption," but that the labor performed can be deemed agricultural "in the case of any horticultural or agricultural commodity," though such labor be performed by persons not employed by the farm owner or tenant of a farm "if performed as `an incident to ordinary farming operations,' and in the case of fruits and vegetables, such services constitute `agricultural labor' even though not performed as an incident to ordinary farming operations, provided they are rendered as `an incident to the preparation of such fruits and vegetables for market.'"
Other decisions have recognized the significance of the federal legislation as did Pioneer and, while holding that the fact that a state has engaged in a cooperative scheme with the Federal Government does not necessarily imply strict uniformity in the incidence of the tax levied by the state and federal laws, the important area of desired co-ordination is noted. Unemployment Compensation Commission of North Carolina v. National Life Ins. Co., 219 N.C. 576, 14 S.E.2d 689 (Sup. Ct. 1941). The court there stated, 14 S.E.2d, at page 695:
"Considering the social security intended to be afforded by the State and Federal laws in their joint adventure, these laws are sufficiently coordinated, provided there is within the State sufficient reciprocity between the employment upon which the tax is levied and those who receive its benefits."
In resolving the issue in the instant case we observe that we are not here dealing with borderline activities, which involve classifying services, which might be characterized as old-fashioned farming, as contrasted with those which clearly involve commercial production or processing of conceded agricultural commodities such as in In re Lazarus, 294 N.Y. 613, 64 N.E.2d 169 (Ct. App. 1945); Burger v. *392 Social Security Board, 66 F. Supp. 619 (D.C.S.D. Cal. 1946); Carstens Packing Co. v. Unemployment Compensation Division of Industrial Accident Board, 65 Idaho 370, 144 P.2d 203 (Sup. Ct. 1943). Those situations present the problem of determining the line of demarcation between the last stages of the agricultural process and the first stages of the industrial process. Nor are we dealing with those situations which involve employees who, for the same employer, work part of the time in an admitted agricultural pursuit and part of the time in conceded non-agricultural work. Although treating the federal legislation, comparable legislation in other states and the decisions thereunder as aids in determining the meaning of agricultural labor as used in the New Jersey Act, we are obliged discriminatingly to determine whether the labor of the employees involved both directly and indirectly in the breeding, raising and slaughtering of mink as performed on the Space farm is such an integral part of the total farm operation as to compel the holding that such labor must be labelled agricultural.
In disposing of the issue in the instant case we are mindful of the holding in Pioneer that the federal legislation is to be considered by us as having "persuasive significance" in interpreting the New Jersey Act; we note that, despite the "remedial" nature of the legislation, we are admonished that "the controlling proviso excluding `agricultural labor' is broad and sweeping, and should not be whittled down by narrowness of construction"; and that the question as to what constitutes "agricultural labor," within the provisions of unemployment compensation acts, depends upon the facts of each particular case.
The case of Fromm Bros. Inc., v. United States, 35 F. Supp. 145 (D.C.W.D. Wis. 1940), relied upon by appellant, was decided after the aforesaid 1939 federal amendment, but involved tax years prior thereto. Plaintiff there sought to recover from the United States a refund of social security tax it had paid for 1936 and 1937, contending that it was exempt for those years because it was engaged in *393 agricultural labor. The court held (35 F. Supp., at page 146) that the growing of silver foxes "is a permanent addition to agricultural development, and has been so recognized by the United States Department of Agriculture, the Farm Credit Administration and other Governmental agencies. Live stock includes fur bearing animals domesticated, and raised in captivity." The court held, however, that because of the facts involved in that case it was clear that, apart from the agricultural work in which the plaintiff was engaged, it conducted commercial enterprises and in its tax returns had failed to segregate the wages paid in the respective pursuits. The commercial ventures in which the plaintiff was found to be engaged were that, while it owned property to the extent of 10,000 acres on which it "raised and pelted" over 5,000 foxes in 1936 and about 7,000 foxes in 1937, during the said years it also "ranged and pelted" approximately 8,000 foxes for corporations which it only partly owned, and in addition conducted on its own property auction sales of the furs and pelts sent to it by other breeders. It offered the same service with respect to such sales as were offered by commercial fur-auction houses, charging a standard commission for conducting the auctions. It also held itself out to be equipped to and did render services of a commercial nature in connection with other auction houses. It charged various shippers of pelts for the cleaning of the pelts; it maintained a New York City sales office. The court emphasized that the commercial aspect of plaintiff's operations was also evidenced by its corporate affiliations, the salaries paid to its official principal employees and the nationwide advertising it conducted. The court noted that only a portion of the pelts sold were from foxes owned by plaintiff and raised on its acreage. Solely because the plaintiff's tax returns did not reveal the wages it had paid in connection with the commercial enterprises noted, as distinguished from those paid in fox farming on its own acreage, the court was unable to determine what wages related to the agricultural endeavor.
*394 In holding that fox farming was an agricultural pursuit the court, in Fromm, cited and relied on an English case entitled In re The Unemployment Insurance Act, 1935 and In re An Application by Stephens and others, [1938] 2 K.B. 675, in which the issue was whether a person employed on a "fur farm" was engaged in agricultural labor within the meaning of the Unemployment Insurance Act of 1936. The farm involved in Stephens consisted of 64 acres, of which 44 were woodland and 20 were grass. On the farm there was pasturage. Mink, rabbits and foxes were there raised. Some of the horses and cattle on the farm were slaughtered to provide fox and mink food. Some of the hay from the farm was used as food for the rabbits; many of the vegetables raised were used for rabbit food. Certain raw meats, cereals, hay and vegetables for feeding the animals were purchased from outside sources. The employees did both general farm work and attended to the animals. The court, in holding that the employees were engaged in agriculture, said (at pp. 681-683):
"* * * it is right to * * * pay regard to the actual occupation of the people who are involved in this issue. They, it appears, are paid according to agricultural wages. They live the lives of agricultural workers. It is true that they are employed in feeding and watering and cleaning foxes, but unless it is to be said that agriculture is stereotyped and that no animal which has been introduced within the memory of man can properly be treated as the subject of agriculture in the sense that it is livestock which is raised upon a farm partly by the produce of the farm and partly by having the land to walk upon, I can see no distinction to be drawn between these foxes and sheep, which, of course, may be grown for mutton, or may be grown for their fleece, and I suppose one might imagine that some sheep may be grown rather for the one reason than for the other. I think it is impossible to say that no animal can be the subject of agriculture when it is being raised upon the land by the produce of the land, unless its flesh is used for human consumption, and that seems to me to be the only real way in which one could distinguish foxes, or mink, from other things such as pigs or cattle, which are undoubtedly livestock in the ordinary sense of the word, and the raising of which, and the feeding of which, and the tending of which, would obviously be regarded by *395 everybody, so long as it is done in the ordinary way upon a farm, as an agricultural pursuit.

* * * * * * * *
* * * My view is that where one has as in these cases, a plot of land in the country being used for the raising of livestock in the shape of fur bearing animals, and at the same time being used to some not inconsiderable extent for the production of food for those animals, persons employed in relation to the feeding of those animals and in relation to the raising of food for them are persons employed in agriculture and therefore entitled from the time at which the Act came into operation to be insured at the rates provided by the Act of 1936."
Appellant also stresses New Jersey legislation in other fields and decisions relating thereto as supporting his contention of the broad interpretation to be accorded to the word "agriculture." He cites Bonham & Young Co. v. Martin, 18 N.J. Misc. 129 (St. Bd. Tax Apps. 1940). In that case petitioner, a corporation, had presented testimony that 70.8% of its capital stock was invested in lands on which extensive operations in the breeding and trapping of muskrat for commercial purposes were conducted. Petitioner was seeking to have certain franchise taxes, which had been levied against it, cancelled because it was an agricultural corporation with at least 50% of its capital stock issued and outstanding invested in agricultural pursuits carried on within the State. The statutory provision relied on was R.S. 54:13-7. The Board found that "* * * the raising and trapping of muskrats constitutes the lands whereon such activity is carried on the subject of an investment for agricultural pursuits."
Appellant also refers us to the Child Labor Law, N.J.S.A. 34:2-21.1(e), which defines agriculture as including:
"* * * farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities * * * the raising of livestock, bees, fur-bearing animals or poultry, * * *."
Respondent, on the contrary, stresses among other decisions, Cedarburg Fox Farms Inc. v. Industrial Commission, *396 241 Wis. 604, 6 N.W.2d 687 (Sup. Ct. 1942), in which the facts were that an employer owned 364 acres; half of the land was used directly in the raising of foxes; the balance was used for raising feed for grazing the draft horses some of which were killed for fox feed. There were also 40 sheep used to keep grass under control between the fox pens. The employer sought a refund of an unemployment compensation tax which he had paid for the years 1934 to 1939. The applicable Wisconsin statute provided that employment under the terms of the act did not include a "farm laborer." The court held that men working in connection with the raising of silver foxes were not farm laborers. It is noted that the court observed that "agricultural labor" was a broader term than "farm labor," and it is also noted that the tax years involved preceded the federal legislative amendment.
Respondent relies in part on Tucker v. Newman, 217 Minn. 473, 14 N.W.2d 767 (Sup. Ct. 1944). In that case an employee had been injured while grinding horse meat for feeding mink and silver foxes. He sought workmen's compensation. Employer contended that the workman was a farm employee. The court sustained the finding that plaintiff was hired to assist in caring for mink and foxes and that defendant's mink and fox operation was so sizeable as to be separate from his farm and was labelled industrial. Defendant had 640 acres, 70 of which were cultivated. On three acres fox and mink pens were located. At the time of the accident respondent had between 900 and 1,000 such animals; also had 50 head of cattle, some milk cows, young stock, four horses and 200 sheep. The court said that it felt that if the raising of fur-bearing animals were on a smaller scale it might be considered incidental to farming, but held in the case then before it the words "agricultural labor" and "farm labor" should be considered in their customarily accepted sense, which did not "comprehend the occupation of raising foxes and mink."
*397 Respondent also cites In re Bridges, 287 N.Y. 782, 40 N.E.2d 648 (Ct. App. 1942), which involved a claim for benefits under that state's labor law. The salient facts as set forth in the opinion were:
"* * * The alleged employer is the owner of a 40-acre farm located at Schuyler Falls on five acres of which pens have been built to house and restrain about 3,000 furbearing animals including foxes, mink and raccoons. The remainder of the farm is used for the maintenance of three cows, the milk being used in part as food for the animals and to supply other types of food in part for the animals. A smaller tract of land near Ausable Chasm is also owned by the alleged employer, and during the summer months many of the animals are transferred there and exhibited to paying visitors.
Claimant and four other employees worked on the farm and at Ausable Chasm caring for and feeding the animals. The claim concerned the year 1937, and as of that date an employee engaged in farm labor did not come within the purview of the statute.
A decision of the Unemployment Insurance Appeal Board which determined that the alleged employer did not conduct a farm and that claimant was not a farm laborer within the meaning of the Unemployment Insurance Law, Labor Law, section 500 et seq., was reversed on the law and facts by the Appellate Division, 262 App. Div. 19, 28 N.Y.S.2d 312, and Frieda S. Miller, as Industrial Commissioner, appeals contending that during the year 1937 claimant was not a farm laborer within the meaning of that term as used in subdivision 1 of section 502 of the Labor Law."
The court in a per curiam opinion held that under the facts above outlined the employer was not entitled to the exemption of the employee as a farm laborer.
The above cited authorities and others serve to emphasize the varied interpretations and definitions given to the phrases "farm labor" and "agricultural labor" under the various federal and state Social Security Acts. Many of them note that the meaning ascribed to those words in legislation in other fields is not helpful because of the dissimilarity of the reasons for the statutory exclusions therein contained. More importantly, however, the cases emphasize the point above stressed that the decision in each case must depend on its own facts. Therefore we reach our decision in the instant case apart from appellant's contention that mink *398 farming is per se an agricultural pursuit, which contention we find it unnecessary to resolve and which contention we believe also is not, as urged by appellant, an inescapable result of the Pioneer decision.
Guided, however, by the mandate expressed in Pioneer that where possible we must harmonize the state law with the federal legislation, we conclude that, under the conceded factual circumstances existing on the Space farm for the years under scrutiny, the employees of that farm should be deemed to be engaged in "agricultural labor." They are beyond question farm workers. They till the fields, plant and harvest crops used for bedding and feeding the animals, both cows and mink; they work for long hours  far in excess of those in industry; many of them live in tenant houses on the farm and have the use of farm produce as part of their compensation; they work indiscriminately in all of the farm operations above outlined. It is an integrated labor effort and the fact that the end result is the production of mink and milk should not change the essential characterization of the totality of their effort.
Many authorities suggest that, as the exclusion is an employee occupational exclusion, the decisive question in determining what is agricultural labor is the nature of the employee's employment rather than the nature of the employer's business. Carstens Packing Co. v. Industrial Accident Board, 63 Idaho 613, 123 P.2d 1001 (Sup. Ct. 1942); Fromm Bros., Inc. v. United States, supra; Farming, Inc. v. Manning, 121 F. Supp. 252 (D.C.N.J. 1954), affirmed 219 F.2d 779 (3 Cir. 1955); however, cf. Dreer, supra. Whether we so regard it or whether we consider the factual situation from the standpoint of the employer's status, as suggested in Dreer, supra (127 N.J.L., at page 153), we would reach the same result on the facts here involved. In Dreer the court expressed the opinion that the various statutory exceptions in the New Jersey act, viewed "as a group," placed the emphasis on the character, relationship and business of the employer, rather than on the kind of *399 work done by the employee. Cf. Hannigan v. Goldfarb, 53 N.J. Super. 190 (App. Div. 1958). Viewed from this angle, the conduct of the Space farm can also justly be deemed an agricultural pursuit and the employees thereon engaged in agricultural labor. It is noted that, in addition to the conceded facts above outlined, Space does not conduct a terminal market for any of his farm products. He sends the milk to a creamery and the mink pelts to a public auctioneer. The fact that the sale of mink pelts produces more income than the sale of milk should not be the controlling factor in resolving the issue in the case at bar.
The determination of the Commissioner of Labor and Industry is reversed. No costs.